(Decided April 30th, 1897).

---

# LAURA A. M. BAKER, Administratrix of HENRY HEDRICH, *vs.* ANNA HEDRICH.

*Ownership of Money Deposited in Savings Bank in Names of Husband and Wife and the Survivor—Earnings of Married Woman Carrying on Independent Business—Costs.*

Where money is deposited in a Savings Bank to the credit of a husband and wife, subject to the order of either or the survivor, such money belongs to the surviving wife, as against the administrator of her husband, if it be shown that the same was her property when originally deposited.

A married woman may carry on independently for her own benefit the business of raising and selling farm products, and the profits thereof belong to her.·

When an administrator files a bill to recover property alleged to have belonged to his decedent and the claim is rejected, he will be required to pay the costs of the proceeding; and the question whether such costs should be allowed out of the funds of the estate is to be determined by the Orphans' Court.

Appeal from a decree of the Circuit Court for Anne Arundel County (JONES and REVELL, JJ.), dismissing the bill of complaint. The deposit in the Eutaw Savings Bank, referred to in the opinion of the Court, amounted to $960.28, and the amount of the deposit in the Savings Bank of Baltimore was $884.53. The certificate of Baltimore City stock was for the sum of $1,500.

The answer of the defendant (appellee) set forth that the above mentioned securities "became the property of this respondent during her long life of laborious industry and frugality, and as the result of the savings of her own labor, skill and industry during more than fifty years of the most patient toil, self-denial and saving economy : that this respondent is now over sixty-eight years of age, and has always more than earned her support since she was fifteen years of age ; that she went to California with her first husband when she was quite young, and after his death, which occurred soon thereafter, this respondent became a professional nurse in the city of San Francisco, where she found quite constant and remunerative employment, at a time and in a place where even the most ordinary labor received wages which would be considered fabulous now and here ; that this respondent was a mid-wife, and also a general nurse for well-to-do people in all kinds of sickness, and even nursed small-pox patients ; that during the intervals of such employments she readily found work in a French laundry in San Francisco, and being of a frugal disposition, this respondent had saved and had to her credit in a savings bank in San Francisco over seven hundred dollars ($700) when she married her late husband, Harry Hedrich, in San Francisco, in July,

1864; that shortly after her marriage to said intestate, they determined to come to the Eastern States, and did so; but before leaving California this respondent drew out of bank her aforesaid savings of over seven hundred dollars, and received the same in gold coin, which was then the circulating medium in California, although specie payments had been suspended in most parts of the United States in consequence of the state of affairs produced by the civil war; that after coming to the Eastern States this respondent sold her gold at a very considerable premium and invested her money in United States six per cent. bonds, known as "5-20-5," which were then very low, and which she continued to hold until they were called in, redeemed by the government; and that she eventually, through her said husband, invested a large part of that very money and of its accumulated interest in the purchase of the aforesaid Baltimore City 3.65-100 per cent. loan certificate for fifteen hundred dollars.

" That after her husband and herself came to the Eastern States as aforesaid, her husband bought about ten acres of poor land in the lower portion of Anne Arundel County, in the year 1865, and there for thirty years her husband and herself lived an humble but happy life of industry and frugality, and there he died in the month of March of this present year. That this respondent and her late husband are both Germans and not afraid of work of any sort; and besides doing all the household work, such as cooking, washing and ironing for herself and husband, and for the complainant and her young brother, who were members of this respondent's family, and the children of the intestate's only sister and heir at law; this respondent constantly assisted her husband as a farmhand in working their little farm, and in sowing, planting, cultivating, gathering and preparing for sale the crops raised on the same, which were chiefly vegetables and what is generally known as truck; that in putting up the various buildings on said property this respondent also laboriously and patiently assisted and worked with her husband, who was himself a skilled me-

chanic; and that her husband and herself, with their own
hands and physical labor, erected almost all of the buildings
and other improvements that were put upon their little farm;
that many and many a day after such work upon said farm
and upon said buildings, this respondent, although healthy
and strong for a woman, has returned to her home and
thrown herself flat upon the floor, completely exhausted by
the severe labor which she had cheerfully undergone; that
her husband and herself kept no servants in the house and
rarely hired any help upon the farm, until within the past
ten years, when her husband's health became delicate and
he was unable to do any work out of doors in winter, and
very little even in the summer; that for the past six years
her husband has been almost entirely incapaciated for work
of any kind from infirm health.

" That shortly after going to live upon said farm, this re-
spondent began raising poultry and eggs for market, and
purchased cows and began making butter for sale; that they
purchased bees, her husband making the hives for them, at
which he was very skillful, and sold large quantities of
honey and of bees-wax; that they always raised and cured
more hog meat than they needed for their own use, and
such excess this respondent disposed of; that this respond-
ent, during all those years that she and her husband lived
on that place, has always attended to the poultry yard and
prepared poultry and eggs for market; has always attended
to the cows, made the butter and prepared it for market;
has prepared the honey and wax for market, and has at-
tended to the hogs and the curing of their meat for market;
that those products of the poultry-yard, the dairy, the
apiary and the meat-house were the results of this respond-
ent's skill and labor, and in recognition of this fact, and of
the great help this respondent has always rendered said in-
testate upon said farm, and by a distinct understanding and
agreement between this respondent and her said husband,
from the time when she began, as aforesaid, to attend to
such matters, all the money earned and received from the

sale of said products has always been the proper money of this respondent and that of no one else, and so always admitted to be by her said husband ; that this respondent has always been successful in raising such products, and received from them far more than the amount represented by the said securities, certificates, books of deposit and other property, now as aforesaid claimed and owned by her; which excess she freely spent, as occasion required, upon the improvement of said real estate and in the support and maintenance of her husband and her household, and in the conduct of said farm, particularly during the past six years when, as aforesaid, her husband's bodily infirmities almost entirely incapacitated him for work ; that as illustrating the success with which this respondent raised and marketed the aforesaid products of her own skill, industry and labor, this respondent avers that she frequently sent to market butter, made by her, in lots as large as forty pounds at a time ; that she sent eggs to market in lots of fifty dozen at a time, and chickens in lots of as many as four dozen at a time; that she has sold as many as fifty turkeys in one season, raised by her and prepared for market by her own hands ; that she has sold bees-wax in five-dollar lots prepared for market by herself; that she has sold in one season bacon, raised, cured and prepared by her, and lard to the amount of over nine hundred pounds ; that she has extracted, prepared and sent to market in one year, honey to the amount of forty-four gallons, which she sold for one dollar and seventy-five cents per gallon, and took to Baltimore herself and sold herself, from house to house ; and that besides all this, she frequently dried and prepared, sent to market dried apples and peaches by the barrel, and large quantities of cherries and other fruits, dried and fresh, gathered and prepared for market by her own hands.

" That during all these years of unremitting toil this respondent was denying herself all unnecessary pleasures and expenditures, stinting herself in food and in clothing, and in what many would regard as the common conveniences and

necessaries of life, so that she might have a support and provision for old age; that the only respect in which this respondent and her late husband were extravagant was in their kindness, generosity and liberality to the complainant in this case and to her brother, both of whom they raised under their own roof, clothed, fed, educated and tenderly cared for from early childhood to mature age; and for whom this respondent cheerfully cooked, washed and toiled for many years; and this respondent avers, that no more wicked scheme of ingratitude and baseness can be imagined than the whole conduct of the complainant in this case since the death of said intestate. * *

" That becoming convinced that it was unwise to keep her savings in their house, she began in the year 1877 to make deposits in the Savings Bank of Baltimore by a deposit of seventy-five dollars on the 24th of March of that year, and continued to make deposits in that bank from time to time, as her husband or herself would happen to be in Baltimore City; that she made her first deposit in the Eutaw Savings Bank of Baltimore on the 13th of May, 1881, by a deposit of fifty dollars, and continued to make deposits of such amounts in that bank from time to time, as her husband or herself would happen to be in the said city; that these moneys so deposited were her own moneys, the fruit and result of her own labor, skill and industry, and to some extent, the income or interest of her other investments before mentioned in United States 5-20 bonds, and of her Baltimore City 3½ per cent. stock aforesaid; that said moneys were in her own possession before taken to Baltimore and so deposited, and when taken to Baltimore by her husband for such deposit, were entrusted by her to her husband for that purpose and as her agent; that the pass-books aforesaid were her own and were always kept by her, and only were in the possession of her husband when the same were being taken to Baltimore by him as her agent for the purpose of making deposits, or having accrued interest and dividends entered thereon, and

on three occasions for the purpose of drawing out a portion of her money so deposited."

The cause was argued before McSHERRY, C. J., BRYAN, FOWLER, BRISCOE, PAGE, ROBERTS and BOYD, JJ.

*James M. Munroe* (with whom was *Frank H. Stockett, Jr.,* on the brief), for the appellant.

1. There are three aspects in which the facts of this case may be considered: (A). Was this property Henry Hedrick's, and did he attempt to give it to his wife by gift *inter vivos?* (B). Was this property Henry Hedrick's, and did he attempt to give it to his wife by a gift *donatio causa mortis?* (C). Was this property the sole and separate property of Anna Hedrick?

(A). This was not a gift *inter vivos.* Because there was no delivery to the donee of the instruments or documents which were the evidences of the subsisting obligations, so as to vest the donee with an equitable title to the funds they represented, and to divest the donor of all present control and dominion over them, absolutely and irrevocably. *Basket* v. *Hassell,* 107 U. S. 614; *Pennington* v. *Gittings,* 2 G. & J. 123, and notes.

(B). This was not a gift *donatio causa mortis:* (1). Because it was not a gift made with a view to the donor's death. (2). Because it was not a gift upon a condition, express or implied, that it should take effect only on the death of the donor by a disorder from which he was then suffering. (3). Because there was no delivery of the subject of the donation. *Taylor* v. *Henry,* 48 Md. 550.

(C). The property in question was not the sole and separate property of the appellee. How did this property become the property of Mrs. Hedrick, and at what time? We have seen that her husband never gave it to her by any disposition thereof legally sufficient to effect that result. Then how and when did she acquire it? What is the proof of her acquiring it?

It is claimed by the appellee that these investments rep-

resent money which she earned in raising poultry, selling butter and eggs, bees-wax and other farm and dairy products, *from her husband's farm.* The evidence of her ownership is chiefly the testimony of the appellee, supplemented by the testimony of several witnesses, that she sold poultry, eggs, butter, &c., and some declarations of the deceased husband in his lifetime, to the effect that the property in question belonged to his wife. (1). As to the answer of the appellee, it is objected by appellant that it cannot be read in evidence, although under oath, because not called for by the plaintiff in her bill under oath. Code, Art. 16, sec. 147. (2). As to the testimony of the appellee, it is objected by appellant that she is not a competent witness. Code, Art. 35, sec. 2; *Murray* v. *Cannon*, 41 Md. 466. (3). The earnings of the wife and the proceeds of her labor are the property of the husband, except when earned by her as a licensed female trader, or earned apart from and independently of her husband. *Neale* v. *Hermanns*, 65 Md. 474; *Poffenberger* v. *Poffenberger*, 72 Md. 324.

It is the husband's right that the wife should work with and for him, and if she does, he is entitled to the fruits of her labor. It is lawful for the wife to engage in labor for her own benefit and independent of her husband, if she choose; but unless she does so, and intends the proceeds for her own separate benefit, the husband is entitled to the profits of her labor. From their relation of husband and wife, she is personally working for him and in his interest, though she has the privilege, if she wishes, to work for herself. Circumstances should show that she had so elected. *Poffenberger* v. *Poffenberger*, 72 Md. 324. Now, what are the circumstances in this case which are relied upon by the appellee to show that she had elected to set herself up in an independent business? (*a*). That she raised and sold poultry, and also sold butter, eggs, bees-wax, &c., from her husband's farm. (*b*). The declarations of the husband, expressive merely of his opinions as to the legal effect of depositing the money in the savings bank in their joint

names, and of investing money in the Jones Falls bond, payable to Henry Hedrick and Anna Hedrick. In *Poffenberger's case* (72 Md. 325), this Court says of such evidence : " In all this we can see nothing which comes up to the requirements of the strict rule laid down by this Court in the case just mentioned. (*Neale* v. *Hermanns*, 65 Md. 477)."

The declarations of the husband, made from time to time, in reference to the ownership of the farm and buildings by himself, and his wife's ownership of the money, though vague and uncertain, might well have been induced by a disposition on his part to appear too poor to lend his money to some of the numerous friends who would have been very glad to have relieved him of the care of it ; and his declaration to Dr. Cheston, being in reply to a question as to the necessity of his making a will in order to secure to Mrs. Hedrick an interest in his estate, is nothing more than the declaration of his opinion as to the legal effect of his deposits and investments to secure that end.

The determination of the question as to the ownership of the savings bank deposits and of the Jones Falls bond, must depend, therefore, upon the *legal effect* of making these investments in that form, and it is the contention of the appellant that the *legal effect* of such investments is to make them assets of Henry Hedrick in the hands of his administratrix. *Murray* v. *Cannon*, 41 Md. 466 ; *Taylor* v. *Henry*, 48 Md. 550 ; *Dougherty* v. *Moore*, 71 Md. 248 ; *Second National Bank* v. *Wrightson*, 63 Md. 81; *Metropolitan Sav. Bk.* v. *Murphy*, 82 Md. 320.

Can anyone doubt that Mr. Hedrick could have changed the form of this deposit and investment in bond whenever he choose ? He made the deposits and purchased the bond, and Mrs. Hedrick was not in any way known in the transaction. If he had done so, could Mrs. Hedrick now sue his administratrix to recover for the wrongful conversion of her money to his own use, or for money had and received by her husband in his lifetime, which *ex aequo et bono* belonged to her ? Most certainly not.

*J. Wirt Randall* (with whom was *James R. Brashears* on the brief), for the appellee.

The wife can acquire property and hold it against her husband and his representatives, with the right to use remedies to secure and protect her title thereto and enjoyment thereof. Code, Art. 45, secs. 1, 4 and 7. The evidence shows that a considerable part of the money represented by the property in dispute comes under that designated in the above cited sec. 1, as " belongiug to a woman at the time of her marriage ; " of course as to such property the appellee's claim is incontrovertible as against the appellant, who claims through the deceased husband, as he always disclaimed any right in it. As to the rest of the money represented in the property in dispute, it makes no difference whether the appellee acquired it in some of the other modes set forth in sec. 1 of Art. 45, *i. e.*, " by purchase, gift, grant," &c., or earned it under section 7 of the same article, " by her skill, industry or personal labor," in either case it is hers, " and the fruits, increase and profits thereof ; " the only limitation being that contained in section 1, namely, that " no acquisition of property passing to the wife from the husband after coverture, shall be valid, if the same has been made or granted to her in prejudice of the rights of his subsisting creditors." *Trader, &c.* v. *Lowe,* 45 Md. 1, 14.

As a matter of fact the money represented by these securities and deposits was partly hers before her marriage, partly " the fruits, increase and profits " of her investments, and partly money earned " by her skill, industry or personal labor," after her marriage.

The appellant contended that as to such of it as the appellee earned by her skill, industry or personal labor, *on her husband's farm*, she can make no claim, as it was his anyhow under the decisions of this Court in the cases of *Neal* v. *Hermann's,* 65 Md. 474 ; *Poffenberger* v. *Poffenberger,* 72 Md. 321, and *Manning* v. *Carruthers,* 83 Md. 1. The appellant's argument seemed to be that to *earn money*, as the Code phrases it, " by her skill, .industry or personal

labor," a married woman must earn it somewhere else than on property belonging to her husband. It is sufficient answer to say that the Code makes no such limitation, this Court certainly made no such limitation in the cases mentioned, and even if were so, it would make no difference in this case; for if the husband had a right to give the wife his own earnings, provided it was not in prejudice of the rights of his subsisting creditors, it could hardly be contended that he did not have the right to give back to her what she had herself earned; and, if he had the right to give it back to her, after it had vested in him (by reason of the fact that she had earned it *on his farm*), he certainly had a right to waive or renounce any interest in it, before it was earned and whilst it was being earned; and this is what his repeated declarations, proved by seven witnesses, show that he did do.

Whilst the common law rule was, undoubtedly, that the husband was entitled to the profits of his wife's labor, yet English Courts of Chancery, more than one hundred and sixty years ago, upheld agreements between husband and wife, very similar to the one proved in this case. *Slanning et al.* v. *Style, &c.*, 3 Peere Williams, 334. In that case, as in this, the husband allowed his wife " to dispose of and make profit of all such butter, eggs, poultry, pigs, fruit and other trivial matters arising from *the farm of the husband* (over and above what was used in the family) *for her own separate use;* and it was proved in the cause, that her husband, whenever any person came to buy fowls, pigs, &c., would say, he had nothing to do with these things, which were his wife's; and that he also confessed that having been making a purchase of about one thousand pounds value, and wanting some money, he had been obliged to borrow one hundred pounds of his wife, to make up the purchase money; therefore the widow claimed this one hundred pounds from his estate." The Lord Chancellor decreed " that the widow was well entitled to come in for this one hundred pounds as a creditor, observing that Courts of Equity have taken notice of and allowed *femme coverts* to have separate interests *by their*

*husband's agreement;* and this one hundred pounds being the wife's savings, and here being evidence that the husband agreed thereto, it seemed but a reasonable encouragement to the wife's frugality, and such agreement would be of little avail, were it to determine by the husband's death ; that it was the strongest proof of the husband's consent that the wife should have a separate property in the money arising by these savings, in that he had applied to her and prevailed with her to lend him this sum ; in which case he did not lay claim to it as his own, but submitted to borrow it as her money.   Wherefore, and especially as here was no creditor of the husband to contend with, it was ordered, that the wife should be allowed to come in for this one hundred pounds, as a creditor, before the master ; and the Court cited the case of *Colmady* v. *Colmady*, where was the like agreement made betwixt husband and wife, that upon the renewal of a lease by the husband, two guineas should be paid by the tenant to the wife, and this was allowed to be her separate money." The doctrine of this case was approved in *Ashworth* v. *Outram*, L. R. 5 Ch. Div. 923.

And aside from the statutory provisions as to *femme sole* traders, &c., the doctrine of *Slanning* v. *Style* has been applied and enforced by the Courts of Equity in this country ; they recognized the duality of husband and wife and his promises to her and settlements upon her, if not in fraud of creditors.   *Moore* v. *Page*, 111 U. S. 117, 118 ; 2 *Story's Equity Juris.*, §§ 1380, 1386, 1387 ; *Sexton* v. *Wheaton*, 8 Wheaton, 229.

If he desert her, or waive his right to her earnings, they are hers, independent of statutes.   9 *Amer. & Eng. Ency. Law,* 667, 792, 818 and cases cited ; *Stall* v. *Fulton,* 30 N. J. L. 430 ; *Peterson* v. *Mulford,* 36 N. J. Law, 481, 487.

And so it has been repeatedly held in this country that a husband may permit his wife to raise and sell grain, stock and other farm products on his farm, as in this case, and receive the profits of the transactions ; and that they are her separate estate as against him and those claiming

through him ; particularly if the rights of his creditors are not thereby compromised. *Bashaw* v. *Chamberlain*, 7 B. Monroe (Ky.), 443; *Oglesby and Wife* v. *Hall*, 30 Ga. 386 ; *Richardson* v. *Merrill*, 32 Vt. 27 ; *Stewart on Husband and Wife*, sec. 469, notes 4 and 7 ; sec. 65, notes 15, 23, 25.

Being hers, was it ever appropriated by the husband with her consent, so as to require under our decisions a distinct promise to repay, to support her present claim ? We answer, No ! There is no evidence whatever of such appropriation ; the evidence is that he considered it hers alone ; and so stated repeatedly to the witnesses before mentioned, and kept her name on the investments and deposits as ear-marks to distinguish them as hers so that she might dispose of them. *Gardner* v. *Merritt*, 32 Md. 84. His dealings with her property were as her agent, and as the fittest person to be her agent ; his powers as such are to be measured by the scope of the authority conferred ; beyond that his acts were invalid. 9 *Amer. & Eng. Ency. Law*, 837, 838, 839 ; *Myers* v. *King*, 42 Md. 70 ; *Cahill* v. *Lee*, 55 Md. 319, 325.

If it could be held that the manner in which the deposit books and the certificate of Baltimore City stock were made out amounted in fact to their being made out in his individual name, still equity would follow them and attach a resulting trust as to them for her benefit. *Ashworth* v. *Outram*, 5 Chan. Div. 923; *Hutchins* v. *Dixon*, 11 Md. 30 ; *Chew* v. *Beall*, 13 Md. 348 ; *Gover* v. *Owings*, 16 Md. 91 ; *Keller* v. *Keller*, 45 Md. 269 ; *Futterer* v. *Kealhofer, Admr., &c.*, Unreported cases, 81 Md. 16.

Boyd, J., delivered the opinion of the Court.

The bill of complaint in this case was filed by the appellant against the appellee to recover certain cash, United States bonds, a certificate of Baltimore City stock, and deposits in the Eutaw Savings Bank and the Savings Bank of Baltimore. The Court below decided in favor of the appellee as to all the items and dismissed the bill. The appel-

lant, after taking an appeal, filed an agreement wherein it is stated that the appeal was not intended to apply to the portion of the decree which adjudged the United States bonds to be the property of the appellee, and has made no claim for them in this Court.   Nor do we understand her solicitors to contend that the claim for the cash has been established.   So far as there seems to be any room for controversy, it is reduced to the question as to whether the titles to the Baltimore City stock and the amounts in the Savings Banks were in Henry Hedrich, the appellant's intestate, or in the appellee, who is his widow.   The certificate of the Baltimore City stock stands in the name of "Henry Hedrich, or Anna Hedrich."   The form of entry in the book of the Savings Bank of Baltimore, is "Henry Hedrich and his wife, Anna Hedrich, subject to the order of either or the survivor;" and in the book of the Eutaw Savings Bank "Henry Hedrich, Anna Hedrich, and the survivor of them, subject to the order of either."

From the view we take of the case it would serve no useful purpose to discuss what is necessary to make a gift *inter vivos* or a *donatio causa mortis*, as that could only become material in the event that we found this property originally belonged to Henry Hedrich and not to his wife. The cases in this Court involving the title to deposits in Savings Banks are quite numerous, and whilst there is no conflict between them, the results reached in them have necessarily differed, as the facts in the respective cases presented different questions.   For example, in *Murray* v. *Cannon*, 41 Md. 466, the deposit was to the credit of "James Cannon, subject to his order, or to the order of Mary E. Cannon," who was his daughter.   It was held that the money belonged to James Cannon, and his daughter only had the power as his agent to draw it out of the bank.   At his death the agency ceased, and as the proof in the case was not sufficient to establish a perfected gift of the money, it did not pass to the daughter.   The case of *Gardner* v. *Merritt*, 32 Md. 78, was relied on as conclusively disposing of

the principal question in the case. There Susanna A. Merritt, the grandmother of the appellants, deposited sundry sums of money in the Savings Bank of Baltimore to their credit in accounts opened in the name of each of them, as a minor, "subject to the order of Susanna A. Merritt, or Susanna Merritt." Susanna was the daughter of Susanna A. Merritt, and after the death of the latter withdrew all the money from the bank and claimed it as belonging to the estate of her mother. The evidence showed that the deposits were made for the benefit of the grandchildren, as Mrs. Merritt herself had stated, and the provision that they were subject to the order of the grandmother and her daughter was in accordance with the by-laws of the bank. This Court held that the moneys thus deposited were perfected gifts and belonged to the grandchildren. In *Taylor* v. *Henry et al.*, 48 Md. 550, the appellees' intestate made a deposit in the Eutaw Savings Bank of Baltimore of $1,850.00, as he was about to take a trip for the benefit of his health. The account was opened and the money credited to Joseph Henry and Mary Henry, his mother, and the survivor of them, subject to the order of either. Sometime afterwards Henry changed the account so as to read, "Joseph Henry, Margaret Taylor and the survivor of them, subject to the order of either." This Court said that "the whole question depends upon the meaning and intention of the deceased in making the deposit in the form adopted, as gathered from the entry in the bank-book, and all the circumstances surrounding the deceased at the time," and held that the words "and the survivor of them" when taken in connection with those which precede, and those which follow in the entry, did not import a gift *inter vivos*, or a gift *causa mortis*. In *Dougherty* v. *Moore*, 71 Md. 248, the account was originally opened in the name of the husband in 1864 and so continued until February, 1868, when the name of his wife was added and an entry made, "Lawrence McDonald, Sarah McDonald and the survivor, subject to the order of either." McDonald·

continued to make deposits and to draw on the account as he saw proper. It was held that it was not a gift *inter vivos*. In *Met. Savings Bank* v. *Murphy*, 82 Md. 314, the account was originally in the name of the husband, but was in 1885 changed to himself and wife, and was "subject to the order of either. The balance, at the death of either, to belong to the survivor." He lived three years and during that time he did not draw out any of the money, and did not retain possession and control of it as was done in *Dougherty* v. *Moore*. For that reason, and because of the express language of the contract that the balance should *belong* to the survivor, we held that the bank was right in paying it to the survivor. Under these and other cases that might be cited, if we were to be governed by the language of the entries in the bank-books, without having any other light on the subject, it might be difficult to sustain the position of the appellee, but this case presents facts altogether different from those in any of the cases above referred to. Aside from the single fact that the husband alone seems to have been present when the accounts were opened, there is nothing in connection with the opening of the accounts to suggest that the husband had any more interest in the money than his wife had. They were opened originally in their joint names, without any legal evidence that the money belonged exclusively to Mr. Hedrich, for there can be no doubt that the testimony of the witnesses produced on behalf of the plaintiff to prove the declaration of the deceased in his own favor, is not competent and cannot be considered by us. But a number of witnesses on the part of the defendant establish the fact that Mr. Hedrich acknowledged that his wife owned the property in controversy. It is shown that she had been for years selling poultry, butter, eggs and other products on her own account, with the full knowledge and consent of her husband. One of the witnesses said "she produced all that could be produced; from my house I could always see her at work and the people going there, and indeed I have often remarked to my people that Mrs. Hedrich's was about

like a store, people were going in there buying things continually." Another said that Mr. Hedrich told him that the money for the butter and eggs was his wife's and he put it in the bank with the other money she had there because he had no right to spend it. He told one of them that when he married Mrs. Hedrich she had $700 in bank in California, and when he came to Baltimore he invested it in government bonds. In answer to the inquiry whether he wanted to leave his wife an interest in the farm he told Dr. Cheston, his physician in his last illness, " No, Doctor, I have made no will, and it is not necessary that I should, she has got enough ; this is mine, this house and lot are mine, and her money is invested in the name of both of us." There is other testimony in the record which we need not quote, going to show that Mrs. Hedrich was for years before her husband's death actively engaged in carrying on an extensive produce business, and that it was fully understood between her husband and herself, as well as the persons dealing with her, that the profits and earnings from that business belonged to her and not to her husband. It is true that the earnings of a wife ordinarily belong to the husband, unless there be some agreement or understanding between them to the contrary, but she can undoubtedly engage in labor for her own benefit and independent of her husband if she choose. *Neale* v. *Hermanns*, 65 Md. 477.

Section 7 of Art. 45 of the Code authorizes a married woman, who by her skill, industry or personal labor earns any money or other property, to hold the same and the fruits, increase and profits thereof, to her sole and separate use, and when the proof shows with sufficient certainty that the money or property in controversy has been thus earned the Court cannot deprive her of it. By the Constitution of this State her property is protected from the debts of her husband, and a Court of Equity should the more readily shield it from the claims of her husband, or of his next of kin. In this case we are not embarrassed by a contest between creditors of the husband on the one side

and his wife or widow on the other, for although the bill was filed by the administratrix, it is not proven or even alleged that there are any creditors unprovided for. If there had been creditors whose claims could not be paid out of the property in the hands of the administratrix, it could very readily have been shown, as the testimony was not concluded for more than a year after the death of Mr. Hedrich. We do not mean to intimate that the testimony fails to establish the appellee's claim, even if there were unpaid creditors of her husband, but a Court should scrutinize the evidence more carefully before deciding a question of this kind in favor of a wife, as against creditors, than would be required in a case between her and her husband or his next of kin.

That Mrs. Hedrich, although a married woman, had the power to conduct an independent business cannot now be questioned, and that she did so, we think is thoroughly established by the testimony. She might have thrown more light on all the transactions before us than any other living person could do, but her evidence must be excluded as it was inadmissible and exceptions to its competency have been filed. The testimony properly in the case has, however, satisfied us that the money invested in the Baltimore City stock and the deposits in the Savings Banks belong to her. They were probably made payable to the order of the two for convenience, as Mr. Hedrich doubtless visited Baltimore and attended to that character of business more than his wife did, but, however that may be, his declarations establish the fact that they belonged to his wife, and it is shown that she had money prior to her marriage and continued to earn it afterwards, and that her husband laid no claim to it. Under such circumstances we can have no hesitation in affirming the action of the Court below in dismissing the bill of complaint.

It was suggested that whatever be our conclusions the plaintiff should not be required to pay the costs, as the claim was made in good faith and in accordance with what

she deemed to be her duty.　If that be conceded, it is not a sufficient reason to require the appellee to pay the costs of proceedings unsuccessfully conducted against her.　If there be sufficient funds in hand, the Orphans' Court can determine whether the appellant should be allowed her costs out of the estate, but that is not before us.

> *Decree affirmed with costs to the appellee.*

(Decided April 30th, 1897.)