(Decided March 3rd, 1898).

---

MAGGIE S. GORMAN *vs.* BRYAN GORMAN, Ex-
ECUTOR, ET AL.

*Gifts—Savings Bank Deposit—Deposit in the Names of Two Persons as Joint Owners.*

M. deposited money in a savings bank in the names of herself and her niece "joint owners, payable to the order of either or the survivor." M. retained the pass-book until her death, when the fund was claimed by the niece as a gift. There was no evidence of any intention on the part of M. to make a gift to her niece, and she left a will by which this fund was bequeathed to other parties. *Held*, that the entry in the pass-book did not itself constitute a gift of the

money, and that since there was no proof of an intention to give and no transfer of dominion over the fund, there was no gift, and the money so deposited belonged to the estate of M.

Appeal from a decree of the Circuit Court of Baltimore City (DENNIS, J.)

The cause was argued before McSHERRY, C. J., BRYAN, FOWLER, BRISCOE, PAGE, BOYD and PEARCE, JJ. (Feb. 17, 1898).

*Edgar H. Gans* (with whom was *B. H. Haman* on the brief), for the appellant.

On June 4, 1895, Theresa McConnell had an account in the Savings Bank of Baltimore in her own name exclusively.   On that day she went to the bank with Maggie S. Gorman.  · She closed her individual account by drawing out all the money, giving a receipt in full and surrendering the pass-book.   Although the cash did not actually pass, the bank gave her a cash ticket which represented the money, and, of course, this is, in legal contemplation, precisely as if the actual money had been paid to her.  *2 Daniel on Negotiable Instruments*, sec. 1601 *a*.   She then redeposits the money in the bank in the following way.   After depositing the money an entry was made in the book of the bank as follows :   " 544,486.   Theresa McConnell and her niece, Maggie S. Gorman, 235 Richmond street, *joint owners;* payable to the order of either, or the survivor, $2,662.63," which was signed by Theresa McConnell by making her mark, and Maggie S. Gorman.

The teller of the savings bank opened the account, and he testifies that it is the invariable rule of tellers who open an account to explain the effect of it to the depositor, that if they ask for a survivor account we make the fact known to them that either one can draw it, and in case one dies the other can get it.   He further testifies that the entry is made this way just for the purpose of avoiding going to the Orphans' Court.   Now, entirely independent of the testimony of Maggie S. Gorman, the appellant contends

that the legal result of these facts is as follows : 1. The individual account of Theresa McConnell was closed by the drawing of the amount therein.　There was no gift or assignment of this account made, and none attempted.　It was simply cancelled by payment.　2. The money thus drawn was deposited with the bank, under an agreement between the bank and Theresa McConnell and Maggie S. Gorman, in writing, and signed by them, that the bank should hold the money for them as *joint owners*.　3. That thereupon they became *joint owners* of the fund, and Maggie S. Gorman is entitled to it as survivor.

The entry contains the words "*joint owners.*"　It must be recollected that the whole question in these cases is, was the party whose name occurs in the entry with that of the depositor, *an owner*, either in part or in whole, of the fund, or was he simply an agent for convenience.　Is it possible to construe "owner" as meaning anything else than that which the word always implies?　If Maggie S. Gorman, after that contract of deposit, was not intended to be an *owner* of the fund with Theresa McConnell, then you must expunge the word "owner" from the contract altogether.　The contention of the appellees is : That Maggie S. Gorman was simply an agent with authority to draw. To support the contention it is necessary to construe the word *owner* to mean *agent* to draw for another.　Can you say of a person in one breath that he is an *owner*, and in another that he is merely an agent to draw for the convenience of another ?　You might as well say that a man is "*owner*" and "*not owner*" with reference to the same thing at the same time.　This is simply perverting the plain meaning of the terms in which the parties to the written contract have expressed their intentions.　The Court below in its opinion argued that the expression *joint owners* had no ascertained legal significance ; that it was ambiguous and might mean tenants in common.　We respectfully dissent from the view.　The expression "*joint owners*" as applied to personal property is as precise, definite and well-

known as the expression "joint tenants," as applied to real estate. It is the expression constantly and always used to indicate joint interests with the right of survivorship by all judges and law writers.

In the prior decisions of this Court the only words used in the entry were "subject to the order of either," and " the survivor of them "—and both of them put together, did not import a present vesting of any ownership in the second party. This we concede. But we contend that the words "joint owners" do conclusively import a vesting of an ownership of a joint character in the second party.

It is well settled that there may be *joint ownership* in every kind of personal property, including deposits in savings banks. 1 *Shoulder Pers. Prop.*, sec. 156; *Mack* v. *Mechs, Sav. Bk.*, 50 Hun. 477; *Williams Pers. Prop.*, 302–3. Now if A has an individual account in a savings bank, and desires that B shall share that money as *joint owner*, how is it effected and brought about? Could it be done in any other way than by A drawing out the fund, and then redepositing it to a new account of A and B as joint owners? It could not be done by A delivering the money to B for deposit, for that would make B the exclusive owner. It could not be done by A giving B half the money and each depositing half, for the deposit would not then be owned jointly "*per my et per tout.*" We press upon the counsel for the appellees an answer to this question. You admit that it is legally possible; now how would you do it to make it legal and binding?

The parties are *sui juris* and have a complete right to make any contract they like not contrary to public policy. It needs no argument to show that contracts creating joint interests in personal property are as valid as those creating joint tenancy in land. Such contracts with savings banks should be upheld, as they save to poor persons and small estates the expenses of legal administration.

There were three parties to the contract: 1. The Bank; 2. Theresa McConnell, and 3. Maggie S. Gorman. The

contract was in writing on the books of the bank and signed by the other two parties. We have seen that the terms of the contract are clear and unambiguous. It is also clear as to what the bank meant, because the uncontradicted evidence shows that they prepared this very form of contract in order that there should be a survivorship without the intervention of the Orphans' Court, and this was impossible, legally, without a joint ownership. How can it be argued that one of three parties to a contract meant one thing, and the other two something different, and so different as to pervert the express terms of a written contract which they have signed. But the testimony shows that both the other parties understood the transaction exactly in the same way as the bank.

A mass of testimony has been given by appellee, none of which touches the precise time of this deposit. Such as that it was a custom in the family to have another name in a pass-book, the provisions of a will executed more than 14 years before her death, certain alleged statements made by Maggie Gorman upon hearing the will read to the effect that it was a correct will, although the proof shows that she did not know what the whole estate was at that time, and such remotely connected facts as the friendly or unfriendly relations of various members of the family. This testimony fills nearly the entire record and we think it all immaterial and utterly inconclusive, when the real question is as to what the parties meant by their written contract of June 4, 1895.

The question of the possession of the bank-book becomes pertinent only when the terms of the alleged gift are ambiguous.

If A has a bank account, and has B's name put on the book, " subject to the order of either," and A retains the book ; in this case the possession of the book by A is pertinent, because there are no clear words in the entry of gift to B. Especially is this true if B claims under the alleged gift an exclusive title, *e. g.*, excluding A. This is *Taylor* v.

*Henry*, 48 Md. 555. On page 558 the Court say : "But as will be observed, there are no *terms in the entry* that import of themselves an actual present donation by the brother to the sister." Then it is to be borne in mind that B was claiming an exclusive title against A. The Court very properly argued that, if B had the exclusive title, why did he not have possession of the book. But suppose A should close his individual account, and redeposit the money in the name of A and B, with this statement on the pass-books and books of the bank, "this deposit is to belong exclusively to B, but the fund is to be ' subject to the order of either,' would his retention of his pass-book have any significance ?"

The possession of the pass-book is never allowed to affect the clear language of the gift. Thus in *Murray* v. *Cannon*, 41 Md. 447, the Court say : " Certainly it cannot be insisted    *    *    *    that James Cannon had parted with legal dominion and control over money standing in his name in the bank, because it was there subject to his order or the order of Mary E. Cannon.    *  ·  *    Nor *does the possession of the book of deposit* by Mrs. Murray (Mary E. Cannon), or her agent affect the result in this case." . There, Mary E. Cannon had the book and had the authority to draw, but it was held that these two things combined did not avail, for the *title* was in James Cannon, and the control of the fund by Mary E. Cannon was only as agent. So in *Gardner* v. *Merritt*, 32 Md. 82, Mrs. Merritt retained the passbook and had authority to draw, and thus retained, in a certain sense, control and dominion over the fund, but it was held that the fund belonged to her grand-children, in whose name the fund was deposited.

Why did not the possession of the bank-book, coupled with the authority to draw, control the question of title in these two cases ? Simply because the terms of the deposit and the surrounding circumstances were so clear as to the *ownership*, that the Court could readily perceive that the possession of the bank-book was not the possession of an owner, but an agent. And yet in these cases, the posses-

sion of the book carried with it the control of the fund so far as the bank was concerned. In truth, the possession of the pass-book is only a circumstance to be considered with the other circumstances in the case. In the case at bar the terms of the contract are absolutely clear ; the parties are to be " joint owners ;" the delivery was complete, for the money was delivered to the bank for the benefit of the joint account, and under these circumstances either has the right to the possession of the book. The possession by one is not referrable to a claim by that one of exclusive *ownership*, any more than the possession by one of two joint payees of a promissory note would be evidence of exclusive owner- ship. If Maggie Gorman had possession of the bank-book from the time of the deposit, could she claim that the fund was *then* her own to the exclusion of Theresa McConnell ? It seems too clear for argument that the possession of one of two joint owners of personal property is possession for both. There is, therefore, nothing in the possession of this bank-book by Theresa McConnell that can influence in any way the clear terms of the contract accompanied by the delivery of the money to the joint account.

*Alfred S. Niles* and *Oscar Wolff*, for certain appellees.

*Michael A. Mullin* and *Joseph C. Mullin*, filed a brief for Bryan Gorman, executor.

FOWLER, J., delivered the opinion of the Court.

The controversy in this case grows out of a dispute as to the ownership of a fund deposited in the Savings Bank of Baltimore. The bank filed a bill of interpleader in the Cir- cuit Court of Baltimore City requiring the claimants, Bryan Gorman, the executor of Theresa McConnell, and Maggie Gorman, to interplead and settle their adverse claims. Both parties answered, each claiming the whole fund; amounting to nearly three thousand dollars. It was held by the learned Judge below that the executor was entitled to the money in the hands of the bank, upon the theory that the

evidence fails to show a complete gift *inter vivos*. Maggie Gorman has appealed.

But for the ingenious and able argument of counsel for the appellant there would, we think, be but little difficulty in the case. For it seems to us that notwithstanding the effort to distinguish this from all the other cases heretofore decided by this Court of a like character, involving questions of ownership of funds deposited on joint account in Savings Banks, the general principles which must decide this case are settled in Maryland and other States as well. It is true the language used here by the bank in making the entry in the deposit book is different from that used in other cases, but after a careful consideration of the entry itself, and all the circumstances of the case, we are forced to the conclusion that it was not and could not have been the intention of Theresa McConnell to make Maggie Gorman a joint owner with herself of the money in question, and secondly, that if any such intention ever existed there was no such delivery of the money as is required to make a perfect gift *inter vivos*. The whole contention of the appellant in this case hinges upon the words "joint owners" used in the entries made by the bank both in the depositors' book and the signature book, which is as follows : " Theresa McConnell and Maggie S. Gorman, joint owners, payable to the order of either, or the survivor."

The circumstances under which this entry was made in the depositors' book are entitled to consideration.

It appears that Theresa McConnell had been for many years a confidential friend and trusted servant in the Wheelwright family, in the city of Baltimore, and that she, and other members of the family, " Theresa was one of them," had been in the habit when opening an account to open it " in the name of the person to whom the money belonged, and a second name was always placed on the bank-book as a matter of convenience in case of illness, and in no way included any ownership in that book." On the 4th of June, 1895, Theresa McConnell had an account in

the Savings Bank of Baltimore in her own name, no second name appearing upon the book. On that day she went to the bank with her niece, Maggie Gorman, the appellant, and had the account standing in her name alone closed, and opened the one which gives rise to this controversy. The testimony as to what took place comes for the most part from the appellant, either from her own testimony, or her declarations testified to by other witnesses. The witness Dorsey, the teller, had no recollection of the transaction, but testified it was the custom of the bank to call the attention of depositors to the words "payable to the order of either or the survivor" and to make the fact known to them that in case one dies the other can get it—provided the survivor produced the book. This testimony as to the importance of the bank-book is very significant when compared with that of the witness Daily, who testified that the appellant told him that she was requested by Theresa McConnell, her aunt, to go to the Savings Bank of Baltimore and that after the deposit was made and the transaction was ended the aunt called her, and the clerk or teller explained that the appellant Maggie would have power to draw the money. The aunt said she understood that; but after leaving the bank, she said to the appellant "was not that a funny remark the clerk made, saying you could draw the money. I don't see how you can draw it when I have the book." Another witness, Mary Daily, testifies that the appellant said that when she was returning from the bank with her aunt, she wanted to see the bank-book, but the desired permissoin was refused. Mrs. Assheton, a member of the Wheelwright family, who was well acquainted with Theresa's feelings in respect to her nieces and nephews, says that she said again and again, that another, not the appellant, was her favorite. It is true that the appellant gives an entirely different account of the whole transaction, but without further comment we deem it necessary only to say that in our opinion the circumstances surrounding the transaction, so far from estab-

lishing an intention to make a gift of the money or any part
of it to the appellant, they show the contrary.

If any such intention existed in the mind of Theresa, that
is, if she intended then and there when the deposit was made
to give the appellant a joint half interest in the bulk of her
fortune, it would be only reasonable to expect that she
would have mentioned it, if not to third persons, then at
least to the appellant herself, and that instead of excluding
her from the interview with the bank clerk when the deposit
was made, she would have been invited to be present.    If
any valid gift was made it was made when the entry was
made, but when we remember that the appellant was never
permitted to put her hand upon the bank-book, until after
the death of Theresa, when the executor allowed her to
have it to draw the money for him, it is difficult to believe
that she had or was intended to have any beneficial interest
whatever in the deposited fund.    But in addition to this, it
must be remembered that Theresa left a will, and that the
fund here in question constitutes a large part of her estate.
This will and the two bank-books, one of which contained
the entry now before us, were carefully guarded, and were
placed in the hands of Mrs. Assheton for safe keeping only
a few months before Theresa's death.    If the money de-
posited in the Savings Bank of Baltimore, as contended, was
during the joint lives of the appellant and Theresa, their
joint property and after the death of the latter belonged to
the former absolutely, what remained of Theresa's estate
was altogether inadequate to gratify the provisions of her
will.    But believing and knowing that she had never given
this money to the appellant, she disposed of it by her will.
We say she disposed of it by her will, not because it is
mentioned therein specifically, but because without it the
provisions made for her kinsfolk in Ireland and this country
were so many idle words.

But it is unnecessary to pursue this view, for, as we have
said, the contention of the appellant rests upon the theory
that the language used in the entry, irrespective of the facts

and circumstances under which it was made, together with the deposit of the money or its representative, a cash ticket, in the bank, operated to make a perfect gift *inter vivos.* What is requisite to make such a gift perfect is so well settled here and elsewhere that only a statement of the rule is necessary. It is briefly and clearly stated in *Taylor* v. *Henry*, 48 Md. 557, by the former Chief Justice Alvey. " To make such a gift perfect and complete, there must be an actual transfer of all right and dominion over the thing given by the donor, and an acceptance by the donee or some competent person for him ; and it is essential to the validity of such gift that it should go into effect, that is, transfer the property at once and completely." What kind of delivery must be made depends upon the nature of the property or thing alleged to have been given. In this case the contention is that the words " joint owners " mean exactly what they imply, namely, ownership and not mere agency with authority to draw. But the question before us is not as to the meaning of the word " owners," or the words " joint owners " in themselves and apart from the connection in which they are used in the entry in the bank-book. And while we may admit that these words have an ascertained legal meaning in themselves, yet we entirely agree with the learned Judge below that they are not used here in the definite legal sense imputed to them by the appellant. Can we for one moment suppose that, with the information we have in this case, the alleged donor intended to put it in the power of the appellant on the day the entry was made to claim, and successfully claim if the appellant's view be correct, one-half of the larger part of the savings of a lifetime. And that in case the appellant should survive, she would get the whole fund, and the beneficiaries under the will, which had been so carefully guarded, would get none of it.

We have said that the question in this case must be decided by the general principles already decided in this State. One of these is that in order to ascertain the intention of the alleged donor as manifested by the entry, not only the entry itself,

but " all the circumstances surrounding the deceased at the time " should be considered. *Taylor* v. *Henry, supra.* In the case just cited the entry was " Joseph Henry and Margaret Taylor, and the survivor of them, subject to the order of either." " It is quite certain," says the Court, " that if the words 'and the survivor of them,' had been omitted in making the entry," the case would have been controlled by *Murray* v. *Cannon,* 41 Md. 466, and the gift would have been incomplete. The contention there in behalf of Margaret Taylor was the same as that made here in behalf of the appellant that the fund was the *joint property* of herself and the depositor—and that the survivor would be the owner of the whole. But the Court held otherwise and said that there were no terms in the entry that import of themselves an actual present donation and that the dominion retained by the depositor over the fund by retaining in his possession the bank-book, " enabled him to displace and utterly destroy all power conferred upon the sister in respect to the fund." And whatever may be the meaning and legal effect of the words " joint owners " generally, we think it impossible to give them the broad signification claimed for them in the connection in which they are used in the case now before us, and with the controlling fact admitted, that Theresa always held possession of the bank-book. The cases of *Dougherty* v. *Moore,* 71 Md. 248, and *Baker* v. *Hedrick,* 85 Md. 645, are quite similar to that of *Taylor* v. *Henry, supra,* and in each of them it was held that the fund did not pass and that there was not a perfect and complete gift *inter vivos.* If it be conceded that this case is to be decided upon the legal, technical meaning of the words " joint owners " placed upon them by the appellant, and that thereby she became a joint owner pure and simple without any limitation whatever, then it might be conceded that the cases of *Murray* v. *Cannon,* 41 Md. 466, and *Gardner* v. *Merritt,* 32 Md. 80, would sustain the theory that the delivery to the bank was a delivery to her and the gift is complete. But we cannot close our eyes to

all the other evidence in this case and give effect alone to *two words* in the entry. In *Murray* v. *Cannon*, the Court said the original depositor retained dominion and control over the deposit by the very terms of the account, and it was therefore held, that his ownership of the fund being beyond dispute, the mere fact that the bank-book was not retained by him could not affect his title or establish that of the persons in whose possession the book was found. Not that the possession of the bank-book is not an important fact to consider in determining the ownership of the fund, but when the ownership is fixed beyond dispute by the entry or in some other way, then the mere possession of the bank-book is not to be taken as conclusive of the ownership of the person in whose possession it may be found. The case of *Gardner* v. *Merritt*, 32 Md. 78, is the common case of a guardian making a deposit *for the benefit* of an infant, the entry containing, immediately after the name of such infant, the words, "subject to the order of" the guardian. It was proved that by the laws of the bank in in that case guardians may deposit for the *benefit* of their wards, and subject such deposits to the control of such guardian. It was held that the *delivery* to the bank *for the benefit* of the infants was a perfected gift to them, and that the control retained by the depositor was such a control as was contemplated by the by-law—a control for the benefit of the infants—and not such a control as would pertain to a continuing legal power and dominion over it. In a word the Court there held that the delivery to the bank and the character of the entry, *under all the proof in the cause*, divested the depositor of her title to the money and vested it in the infants. But, as we have already said, such is not and cannot reasonably be held to be the effect of the entry and delivery in this case when viewed in connection with all the evidence in this case. In the case of *Murphy* ats. *The Met. Sav. Bank*, 82 Md. 319, the language construed is this, "subject to the order of either. The balance at the death of either to belong to the survivor." The whole amount was

paid by the bank to the survivor. We said, " The only question which we are now called on to decide is, had the bank authority in law to make such payment?" And we held that inasmuch as the depositor who originally owned the money entered into a contract with the bank, the bank had only done its duty by complying therewith—and we refused after such payment by the bank to require it to pay a second time. It was also said that the transaction took somewhat of an equitable assignment, looking to the interests of the parties rather than to matter of form.

But in the case we are now considering there is no question as to the rights of the bank under the contract of deposit, but the object is to ascertain who is the legal and true owner of the fund. It may well be, as said by the learned Judge below, that as between the depositor and the bank, perhaps the entry in the bank-book might be conclusive; and if the bank had paid the money according to the terms of the entry, it might be protected; but as between the depositor or her executor and the appellant the entry is not conclusive. It is a fact to be considered in connection with the other circumstances of the case to determine the donor's intention. As we said in *Baker* v. *Hedrick*, what we decided in *Met. Bank* v. *Murphy* was, that under the facts of that case and because of the express language of the entry, that the balance should *belong* to the survivor, *the bank was right in paying it to the survivor.* Nor is there any suggestion here that we are now dealing with an equitable assignment of the fund. On the contrary, the contention is that by virtue of the language of the entry there was at the time it was made, a full, complete and legal transfer to the appellant of a joint interest, and such a delivery as was necessary to make a perfect gift *inter vivos.* But, as we have already said, we cannot adopt this view.

> *Decree affirmed, costs to be paid by*
> *the executor out of the fund.*

(Decided April 1st, 1898).