# MARY WHALEN *vs.* ARTHUR V. MILHOLLAND,
## EXECUTOR, &C.

*Gift of Savings Bank Deposit by Delivery of the Pass-Book—Evidence—Deposit in Names of Two Persons as Joint Owners—Gifts Mortis Causa.*

When the owner of money deposits it in a Savings Bank to his and another's credit as joint owners and retains the pass-book so as to continue his dominion over the fund, then an absolute delivery of the book to the other person named as co-owner with the intention to make an irrevocable gift of the fund and an acceptance by the donee constitutes a valid gift.

In this case, where such deposit had been made, it was held upon the facts that the evidence failed to establish that there had been an absolute delivery of the pass-book by the donor to the donee.

The deposit of money in a Savings Bank in the names of the depositor and another person as joint owners, payable to the order of either and the survivor, is not of itself sufficient to constitute a gift of the money to such other person who becomes the survivor if the depositor retains possession of the pass-book.

In the case of a gift *mortis causa* the proof of delivery must be clear and decisive.

Appeal from a decree of the Circuit Court of Baltimore City (WICKES, J.)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, PAGE, ROBERTS, PEARCE and SCHMUCKER, JJ.

*Francis T. Homer* (with whom was *George R. Willis* on the brief), for the appellant.

*James McColgan* and *Charles W. Milholland*, for the appellee.

McSHERRY, C. J., delivered the opinion of the Court.

The controversy in this case grows out of a Savings Bank deposit. There are two claimants of the fund. The Savings Bank filed a bill of interpleader making them parties. The contest is, consequently, confined to them.

It is undisputed that on and prior to May the sixth, eighteen hundred and ninety-one, Elizabeth O'Neill had on deposit to her own credit in the Savings Bank of Baltimore, the sum of two thousand one hundred dollars and forty-two cents. And it is equally beyond contention that this money belonged to her and to no one else. On that day she closed the account, and the same money was, at once, entered to the credit of Elizabeth O'Neill and her sister, Mary Whalen. Whether the money was really drawn and re-deposited does not appear; but as such a course was wholly unnecessary to effect the change actually made, it is highly probable that it was not resorted to. The entry, as it now stands in the deposit or pass-book, is in these words : "Elizabeth O'Neill and Mary Whalen. Joint owners. Payable to the order of either or the survivor." When this account was opened on May the sixth, it read : "Elizabeth O'Neill and Mary Whalen. Payable to the order of either or the survivor," but later on the words "joint owners" were added, when that form was adopted by the bank. Both of these entries were placed on the deposit or pass-book by a stamp. There is nothing whatever in the record to show when the words "joint owners" were stamped upon the pass-book, and not the slightest suggestion that they were placed there with Miss O'Neill's knowledge or consent. She could not read and there is no evidence tending to show that she knew the words "joint owners" were there. After the account was opened she added by deposits and accrued interest the sum of one thousand and three dollars and thirty-six cents, and she drew out amounts aggregating six hundred and thirty-six dollars and five cents. She retained possession of the pass-book from the opening of the account up to the time of her decease, unless the contention of Mrs. Whalen that it was delivered to her a few hours before her sister's death, is well founded. Miss O'Neill died in September, eighteen hundred and ninety-seven, leaving a last will and testament. Mr. A. V. Milholland is named as the executor therein. Mary Whalen claims the funds in

dispute; and she claims them under the terms of the deposit and by virtue of an alleged delivery of the pass-book; whilst on the other hand the executor of Miss O'Neill insists that they are payable to him as assets of her estate.

Starting with the concession, or if not with the concession, with the indisputable fact, that prior to the deposit of May the sixth, the money in controversy was the property of Miss O'Neill, there is no escape from the conclusion that it continued to be hers and now forms part of her estate, if she did no act by which she parted with that ownership. There is no pretence that anything evidences a surrender by Miss O'Neill of her interest and estate in this money, other than the entry in the pass-book and the alleged delivery of that book, or both combined.

This Court has frequently had occasion to consider cases growing out of similar deposits. There ought not now to be, even if there ever was, any uncertainty about the legal principles which should control the decision of such a controversy. The money being the property of the depositor, the fundamental question always is : Has a valid and effective gift been made of it to another ? To make a gift perfect and complete, there must be an actual transfer by the donor of all right and dominion over the thing given; and there must be an acceptance by the donee or by some competent person for him. In addition to this it is essential to the validity of such gift, that it should go into effect, or in other words, transfer the property, at once and completely; for if it has reference to a future time when it is to operate as a transfer, it is nothing more than a promise without consideration, and cannot be enforced either at law or in equity. Until the gift is legally perfect and complete, a *locus penitentiæ* remains, and the owner may make any other disposition of the property that he or she may think proper. *Taylor* v. *Henry & Bruscup, Admr.*, 48 Md. 557 ; *Gorman* v. *Gorman*, 87 Md. 338 ; *Pennington* v. *Gittings*, 2 G. & J. 208 ; *Murray* v. *Cannon*, 41 Md. 476 ; *Dougherty* v. *Moore*, 71 Md. 249. " There is no case," said GIBBS, C. J., "which

decides that the donor may resume the possession and the donation continue." *Bunn* v. *Markham*, 7 Taunt. 214.

It needs no discussion, especially since the decision of the cases of *Taylor* v. *Henry & Bruscup, supra*, and *Dougherty* v. *Moore, supra*, to show that the entry as originally made, viz. : " Elizabeth O'Neill and Mary Whalen, payable to the order of either or the survivor," is wholly insufficient to effect a transfer and delivery of the funds to Mrs. Whalen, or to place them beyond the power of Miss O'Neill to reclaim.   The deposit in the names of Miss O'Neill and Mrs. Whalen was payable to the order of either or the survivor. Miss O'Neill having by this form of entry retained undoubted power to draw the money out of bank whenever she pleased, obviously did not divest herself of dominion over it.   There was nothing to prevent her from checking out every cent of the fund immediately, or at any time, after the deposit in the two names had been made.   If this be true—and it cannot be questioned—there was no perfected gift to Mrs. Whalen, and she, consequently, acquired no interest in the fund by the form of the entry as it then stood.   The form of the entry in the *Taylor case* was : " Joseph Henry, Margaret Taylor, and the survivor of them, subject to the order of either ;" and in the *Moore case*, it was : " Lawrence McDonald, Sarah McDonald and the survivor, subject to the order of either."   These are identical in legal effect with the entry we are now dealing with (for we are excluding, for the present, the words "joint owners") and both were held to be insufficient to transfer the funds to the survivor.

But much stress was laid on the words "joint owners," which were subsequently stamped on the pass-book.   Of themselves these two words, as we said in *Gorman* v. *Gorman, supra*, are not sufficient in a deposit made in a Savings Bank, to transfer title to the fund—that is, they are not sufficient to convert the fund from being the property of the person to whom it belongs into the property of the original owner and another individual.   Whatever their technical import may be when employed in other instru-

ments, they cannot operate to vest an ownership to the extent of one-half of the fund in some one else, when, under the terms and according to the legal effect of the very paper in which they are used, the depositor retains such a dominion over the fund deposited that he may at any moment withdraw the whole of it.   If these two words do not restrict the authority of the depositor to draw the money, they do not limit or curtail his control over it; and if his control over it is not limited or curtailed, there is obviously left to him a *locus penitentiae*, and there is, consequently, no perfected donation.   That the words "joint owners" do not, and were not intended to, restrain the depositor from forthwith drawing out of bank the whole fund deposited, is apparent; because, in spite of their use, the other words of the entry expressly declare that the fund shall be payable to either of the parties named, and therefore, to the one to whom it originally belonged and who caused the entry to be made in that particular form.   Always bearing in mind that the fund belonged to only *one* of the parties named as joint owners, and that you are searching for evidence tending to show a gift of that fund, or of a part of it, to a person who confessedly in the first instance owned none of it, the control retained over the *whole* of it by the original owner under the very terms of the deposit which he makes, is of great significance in repelling any inference that he intended to part with his ownership in any way whatever.   Particularly is this so when the original owner retains possession of the pass-book and when the deposit is made in a Savings Bank, by the rules of which the book must be produced before the deposit can be withdrawn.

There is, however, another reason why the addition of the words "joint owners" cannot, in this case, enlarge or change in any way the original entry to the credit of Miss O'Neill and her sister.   Those words were placed on the book, not because Miss O'Neill requested the bank officers to do so, and not because *she* thought they would, or designed they should vest an indefeasible interest in her sister,

but merely because the bank had adopted that form, as testified by the assistant treasurer, " to make it uniform "— though uniform with what he did not say. The words were put there not as expressing Miss O'Neill's intentions or as limiting her control over the funds, but manifestly to carry out some policy or theory of the Savings Bank. They represent and stand for no voluntary, deliberate act of hers at all. In the face of these facts, whatever the import of the words might be, had they been consciously and purposely used by Miss O'Neill, they certainly can be given no weight or potency.

Whilst it may be conceded that Miss O'Neill intended this fund to belong to her sister should the latter survive her—and there are quite a number of her declarations in the record indicating that she did—still, the method resorted to by her for the accomplishment of that end, cannot, so far as the entry in the book is concerned, be treated as efficacious. The entry did not constitute a valid gift *inter vivos*, as we have already pointed out ; and it cannot, for obvious reasons which need not even be suggested, operate as a testamentary disposition of the fund. The money, therefore, belonged to the original owner at the time of her death, unless the delivery of the book to Mrs. Whalen, or the entry and the delivery together, constituted a valid donation.

If we assume for the moment that the evidence satisfactorily establishes a delivery of the bank-book to Mrs. Whalen by Miss O'Neill, the question is then presented as to whether the gift and delivery of a bank-book containing the entry that this one embodies, including the words " joint owners," amounts to, and is, in law, a delivery of the money credited in the book. In *Murray* v. *Cannon, supra,* where the entry was " James Cannon, subject to his order, or to the order of Mary E. Cannon," the possession of the book by the claimant, the alleged donee, Mary E. Cannon, did not effect a transfer of the fund to her. " Its delivery to her," said this Court, " cannot be said to operate as a delivery to her of the money in question, or to deprive James

Cannon of dominion and control over it. This branch of the case," the opinion goes on to declare, " is within the principle decided in *Ward* v. *Turner*, 2 Ves. Sr. 431. There the bill was to obtain a transfer of South Sea Annuities, upon the ground that the receipts for them had been delivered to the complainant's testator, the donor saying, ' I give you these papers, which are receipts for South Sea Annuities and will serve you after I am dead.' This was held not to be a perfected gift, because the delivery of the receipts was not a delivery of the annuities, as they could only be delivered by a transfer or something equivalent. So in this case the delivery of the book of deposit did not constitute a delivery of the money, which it is claimed was the thing intended to be given, because its delivery could not be effected in that way." To change the fund from the name of James Cannon to that of the alleged donee required a check drawn by the depositor or by his agent, Mary Cannon, during his life ; because upon his death her agency terminated. She was not named in the deposit-book as a joint owner of the fund. The possession of the book may be a circumstance to be considered in determining the ownership of the fund, " but when the ownership is fixed beyond dispute by the entry or in some other way, then the mere possession of the bank-book is not to be taken as conclusive of the ownership of the person in whose possession it is found." *Gorman* v. *Gorman*, *supra*. In *Dougherty* v. *Moore*, *supra*, we said : " We shall not stop to consider whether an assignment in writing and delivery to a donee of a pass-book of a Savings Bank by the donor, with the intention to give and vest in the donee the immediate right and interest in the money held on deposit, will constitute a valid gift of such deposit. In some States it has been held that such an assignment and delivery will vest in the donee a valid title to the money." We have cited these cases, the only ones in this State that we now recall bearing on this precise question, to show, *first*, that in an instance where the terms of the deposit did

not purport to create an interest as donee in the claimant, the delivery of the book did not transfer the ownership of the money on deposit; *secondly*, that mere *possession* of the book, worded precisely as is the one in this proceeding and issued by the same bank which gave to Miss O'Neill the book we are now considering, whilst a fact to be weighed in deciding the question as to who owns the funds, was held not to be conclusive evidence of ownership ; and *thirdly*, that where the necessities of the particular case did not require a decision of the point, we refrained from determining whether a written assignment and delivery of a deposit-book would constitute a valid gift of the deposit.     Possession is distinguishable from delivery.    There may be possession where there has been no delivery.; but there can be no valid delivery unless possession, actual or constructive, accompanies it.     Where, however, it appears that the original owner purposely deposited the fund to his and another's credit as joint owners, retaining the pass-book so as to continue his dominion over the money ; a distinct, unequivocal delivery of the book to the other person named as co-owner, with the intention to part with the ownership and to make an irrevocable gift of the fund and an acceptance of it by the donee, would pass the whole interest therein to the donee, because there would then be no inconsistency between the legal effect of the entry on the book, and the right in which the donee of the book could claim the deposit, and there would no longer be a *locus penitentiæ* in the original owner. Every element of a perfected gift would then be present.   In *Cannon's case* the legal effect of the entry was simply to make Mary E. Cannon an agent to draw the money for the owner, James Cannon, and the delivery of the book to her was a delivery to her in her capacity as agent.    We are not discussing a gift *mortis causa* as in *Conser* v. *Snowden*, 54 Md. 175.   In that case there was no delivery of the book and the plaintiff failed to prove that the donor died of the disorder of which she was suffering when the gift was made and that there had been no intervening recovery.   Apart

from the circumstances that the gift is made with a view to death; and that it is upon condition, express or implied, that it shall take effect only on the death of the donor, by a disorder from which he is then suffering; a delivery that is sufficient to perfect a gift *mortis causa*, will be equally good to constitute a valid gift *inter vivos*. By the terms of the deposit Mary Whalen was authorized to draw the money upon presentation of the book. The delivery to and acceptance by her of this book as a gift—if in point of fact there was such a delivery and acceptance—clothed her with complete dominion over the money, even as against Miss O'Neill, and of course, therefore, as against the latter's personal representatives, and left nothing further to be done to consummate the donation. The entry in the book placed the fund to her credit jointly with her sister—though vesting no interest in her—but the ownership of the book by gift conferred upon her authority to draw the whole fund for her own use; thus differing radically from *Cannon's case* and *Snowden's case*. The great weight of authority supports the proposition that a gift of Savings Bank deposits by delivery of the pass-book is a valid and complete gift of the money. *Ridden* v. *Thrall*, 125 N. Y. 572; *S. C.*, 11 L. R. A. 684 and notes; *Pierce* v. *Boston Five-Cent Sav. Bk.*, 129 Mass. 425; *Hill* v. *Stevenson*, 63 Me. 364; *Tillinghast* v. *Wheaton*, 8 R. I. 536; *Camp's appeal*, 36 Conn. 88; *Penfield* v. *Thayer*, 2 E. D. Smith, 305; *8 Am. & Eng. Ency. L.* (1st ed.) 1326, note 3, and the numerous cases there collected. A Savings Bank book has a peculiar character. It is not a mere pass-book, or the statement of an account; it is issued to the person in whose name the deposit is made, and with whom the bank has made its contract; it is his voucher, and the only security he has, as evidence of his debt. The book is the instrument by which alone the money can be obtained, and its possession is thus some evidence of title in the person presenting it at the bank. "We can have no doubt," says the Supreme Judicial Court of Massachusetts, "that a purchaser, to whom such a book is

delivered without assignment, obtains an equitable title to the fund it represents, and a title by gift, when the claims of creditors do not affect its validity, stands on the same footing as a title by sale." *Pierce* v. *Boston Sav. Bk.*, *supra*. A deposit in a bank of issue, discount and deposit cannot be transferred by a delivery of the pass-book, because wherever the book may be, the depositor may withdraw the fund by check. Possession of a deposit-book in such a bank does not give a dominion or control over the fund, and hence cannot operate, by a delivery, to transfer ownership of the money deposited. *Jones* v. *Weakley*, 99 Ala. 441 ; *S. C.*, 19 L. R. A. 700. Many of the cases cited or referred to above go to a very much greater extent than we think necessary, and we are not to be understood as adopting them without qualification. So far as they support the doctrine that a gift of a Savings Bank book, *worded as this one is*, constitutes a valid donation of the deposit, we accept and approve them, but no farther.

We hold, then, that if this deposit had been made by Miss O'Neill in her own and her sister's names as joint owners, payable to the order of either or the survivor, though all the money was in fact the property of Miss O'Neill ; and if thereafter she had deliberately given the book to her sister with the intention of donating the fund to her, and had reserved no control over it herself ; upon the acceptance of that gift by Mrs. Whalen there would have been a perfected gift of the money, vesting the ownership thereof in Mrs. Whalen and entitling her to the possession of it.

Though the delivery of the pass-book would have been a delivery of the fund, the circumstances developed in the testimony fail to show a delivery of the book by Miss O'Neill to Mrs. Whalen. There is but a single witness who undertakes to prove the asserted delivery of the book, besides Mrs. Whalen. Their testimony, when weighed in connection with other facts, falls far short of establishing either an actual or a constructive delivery of the book. The witness, Mrs. Rhatigan, thus describes the gift :   " Miss Elizabeth O'Neill

told Mary that she never gave her anything while she lived, and that her two bank-books was in the wash-stand drawer and she could have the money, and to take care of it as well as she did." She further stated that this occurred on Friday *afternoon*, September the twenty-fourth, and Miss O'Neill died Saturday morning about one o'clock. This witness also testified that the wash-stand drawer was locked and that Mrs. Whalen had the keys. Miss O'Neill became unconscious about four or five o'clock Friday afternoon, and continued so until her death. Mrs. Whalen testified that she hunted for her sister's keys and found them between the two mattresses and the bolster of the bed upon which Miss O'Neill was lying. She was then asked : " How long had your sister been dead when this search was made ?" and she replied : " She was not over two hours dead ; the undertaker was there ; I just raised her up from the mattress and got them and put them in my pocket." At this point her counsel interposed and remarked : " You started to stay, ' I did not go right away when she told me,' and I did not hear the balance ; please complete it." And she then went on : " I asked her where the keys were, and she did not know, and I raised up the mattress and got them ; she said, have you got them ; and I said yes, and she said those books in that wash-stand drawer are yours, take good care of them ; that is what I thought she said ; that is the very words she said." This is all the evidence there is of a delivery of the bank-book. Mrs. Whalen first explicitly stated that she did not get possession of the keys until two hours after her sister's death ; and in the very next breath she asserts that she got them from under the mattress whilst her sister was still living. She got the bank-book the Monday following Miss O'Neill's death. Mrs. Rhatigan places the delivery of the books— such as she described it—in the afternoon ; but it is quite apparent she left the house about noon and did not return until Miss O'Neill was unconscious. Mr. Milholland testified that Mrs. Whalen and other relations of the deceased

called at his office to hear the will read, two days after the funeral. He then asked Mrs. Whalen if she had any papers or books belonging to her sister ; she replied that she had some papers but no bank-books ; whereupon a niece who was present insisted that Mrs. Whalen had two bank-books belonging to Miss O'Neill, but Mrs. Whalen stoutly denied that she had any bank-books whatever. The day following Mrs. Whalen called again upon Mr. Milholland and handed him two bank-books—the one in controversy and another —Mr. Milholland thereupon asked her if any of the money in the bank was hers and she answered, " No, that none of it was hers—that none of it belonged to her." The gift set up and relied on was made, if made at all, when the owner of the money was *in extremis.* The claimant's version of the transaction is exceedingly unsatisfactory ; and her distinct and emphatic assertion to Mr. Milholland that the money did not belong to her, spoken so recently after the alleged gift had been made, that she could not well have forgotten that the money was hers if it had been in fact given to her but a few days previously, make it highly probable that loose and incoherent expressions of a dying woman have, as time wore on, grown, perhaps unconsciously, into the shape and form they now present through the testimony of these two witnesses. These death-bed donations, to be upheld, ought to be above question or surpicion at all times, but more especially when they render inoperative, as they would in this case, the provisions of a will made at a calmer and more collected moment. The evidence to support them ought to be clear and free from uncertainty, for the temptation to seize upon disjointed sentences uttered when the physical frame is prostrated and the mental faculties are failing, and to convert them into a deliberate gift of the bulk of a dying person's estate, might be too often yielded to under the influence of interest or the promptings of avarice, and produce most grievous wrongs. The facility with which such gifts may sometimes be proved is suggestive of great caution in weighing the evidence

adduced to maintain them.   To doubt them ought to be to deny them.   " Around every other disposition of the property of the dead the Legislature has thrown safeguards against fraud and perjury ; around this mode (*donatio mortis causa*) the requirement of actual delivery is the only substantial protection, and the Courts should not weaken it by permitting the substitution of convenient and easily proven devices."   *Keepers* v. *Fidelity Co.*, 56 N. J. L. 302 ; *S. C*, 23 L. R. A. 184.   Mindful of the facility with which, after the alleged donor is dead, fraudulent claims of ownership may be founded on pretended gifts of his property asserted to have been made whilst he was living, it is but a salutary precaution which demands explicit and convincing evidence of every element needed to constitute a valid donation whether it be a donation *inter vivos* or *mortis causa.* Even then, fraudulent claims may prevail, but the rigid requirement of the clearest proof will at least diminish the number.

In our judgment the evidence adduced to prove the gift of the bank-book is too inconclusive and vague to support the appellant's claim.   For this and the other reasons we have assigned the decree awarding the fund in this case to the executor of Miss O'Neill must be affirmed with costs.

> *Decree affirmed with costs in this Court, the costs below to be paid as directed in the decree appealed from.*

(Decided March 16th, 1899).