WILLIAM  GERTING et al. vs. MINNIE L. WELLS

*Witness—Competency—Property Alleged to Have Been Withheld From Inventory by Executor and Trustee—Sufficiency of Evidence—Presumption as to Ownership—Decree in Conformity With the Evidence and Not the Allegations—Exceptions—Appeal.*

When an executor and testamentary trustee alleges that certain property once belonging to the testator had been given or transferred to him, he is not a competent witness, under Code, Art. 35, sec. 3, to testify as to transactions with, or statements made by the testator.

When two men deposit bonds with a trust company receiving therefor a a certificate of deposit in their joint names, the presumption is that they are co-owners of the bonds.

This presumption is not overcome by evidence of the declarations of one of the men to third parties that he did not own any bonds.

Upon a petition in equity by a *cestui que trust* against an executor and testamentary trustee, alleging that he had not returned in the inventory or accounted for property belonging to the trust estate which had come into his possession as executor or trustee, the evidence examined and held to establish that certain property belonged to the trust estate and should be accounted for by the trustee.

When no objection is made to the sufficiency of the averments of a bill or

petition in equity, it is the duty of the Court to decree according to the proofs, and the objection that the relief decreed was not in conformity with the relief asked for, cannot be availed of on appeal, since Code, Art. 5, sec. 36, provides that no objection to the sufficiency of the averments of a bill or petition in equity shall be made in the Court of Appeals unless it shall appear from the record that such objection was made by exceptions filed in the trial Court.

The noting of an exception to testimony before an examiner is not a compliance with this provision of the Code when no exception is afterwards filed in the cause.

Appeals from the Circuit Court of Harford County (FOWLER and VAN BIBBER, JJ.)

The cause was argued before McSHERRY, C. J., BRISCOE, PAGE, PEARCE, SCHMUCKER, JONES and BURKE, JJ.

*John Prentiss Poe, John S. Young* and *C. Howard Millikin* (with whom was *Sylvester E. Penning* on the brief), for the appellants.

*Stevenson A. Williams* and *Thos. H. Robinson* (with whom was *Joseph W. Chamberlain* on the brief), for the appellee.

BURKE, J., delivered the opinion of the Court.

On the 16th day of August, 1892, Charles Gerting of Harford County, Maryland, executed a last will and testament by which he devised and bequeathed his whole estate in trust to his brother, William Gerting, whom he constituted his sole executor, without bond. The testator died on the 31st day of August, 1892. The clause of the will by which the trust was created is as follows: "I give, devise and bequeath to my brother, William Gerting, all my estate real, personal and mixed of which I die seized in trust for my daughter and only child, Minnie E. Gerting, until she arrives at the age of twenty-five years, when the said trust shall cease, and the said property shall vest absolutely in the possession of the said Minnie Gerting. In the event of the death of the said Minnie Gerting without legal heirs or heir, I give and bequeath to my brother, Frederick Gerting, the sum of two thousand ($2,000.00) dol.

lars current money.　All the rest and residue, and the remainder of my estate real, personal and mixed of every kind, and wherever the same may be situated, I give, devise and bequeath to my brother, William Gerting, of the city of Baltimore, in the State of Maryland, his heirs, personal representatives and assigns.''

In 1897 his daughter, who is the appellee, married Edward C. Wells.　William Gerting qualified as executor, and settled his accounts in the Orphans' Court for Harford County, by which it appears that the total amount which came into his possession as executor of the estate of his brother Charles was the sum of $18,557.24.　In 1899, upon a bill filed by Mrs. Wells against William Gerting, the Circuit Court for Harford County, sitting as a Court of equity, assumed jurisdiction of the trust created by the will of Charles Gerting, and required William Gerting to give bond for the faithful discharge of his duties as trustee thereunder.　The bond was given as directed, and thereafter the trust was administered under the direction and control of the Court, and the income of the estate was paid to Mrs. Wells as provided by her father's will.

After Mrs. Wells had arrived at the age of twenty-five years, William Gerting as trustee filed a petition in said cause asking the Court to construe the will of Charles Gerting, and to determine whether the estate of said deceased then in his possession as trustee should be paid and transferred to Mrs. Wells, or whether the trust should continue to await the event of the death of the testator's daughter and the contingency of her leaving issue.　The Court on the 31st day of December, 1903, decreed that the trust had ceased and terminated, and directed the trustee to deliver and transfer the whole trust estate to Mrs. Wells.　An appeal was taken to this Court, which affirmed the decree of the lower Court.　*Gerting* v. *Wells*, 100 Md. p. 93.　Upon the affirmance of the decree of the Circuit Court of Harford County, the trustee accounted for and paid over to Mrs. Wells the whole trust estate, as shown by his inventories and accounts filed and passed in the Orphans' Court of Harford County.

Prior to the decision of *Gerting* v. *Wells*, 100 Md. *supra*, Mrs. Wells on the 31st of March, 1903, filed a petition in the pending case in the Circuit Court for Harford County in which she made the following charges against William Gerting, trustee, and his son, William E. Gerting, and praying that certain specific relief might be granted, viz.:

· *First*. That William Gerting, executor and trustee under the last will and testament of Charles Gerting, deceased, was a brother of the said Charles and the uncle of your petitioner, and that at the time of the death of the said Charles your petitioner was a child in her fifteenth year, and that the said Charles had been a widower for eleven years before his death, and after his death your petitioner resided four or five years with the said William Gerting, who was the only paternal uncle she knew, although the said Charles left two other brothers one of whom resided and now resides in Baltimore City and the other in the city of Brooklyn.

*Second*. That your petitioner had confidence in her said uncle, William Gerting, and it has not occurred to her until recently to doubt the honesty and good faith of the said William in the conduct and management of the estate of her father.

*Third*. That it has recently come to the knowledge of your petitioner, and she now charges that in addition to the moneys belonging to her father, the said Charles, which are set forth and accounted for by the reports heretofore filed by the said trustee in this cause, there were other moneys and securities which came into the hands of the said William with which he is chargeable as executor and trustee in this case, and for which he has hitherto failed to account although such account has heretofore been duly demanded in this case, that is to say:

(*a*) Northern Central Railway Company second mortgage five per cent bonds of the par value of ten thousand ($10,000.00) dollars.

(*b*) 5 Shares in the steamer Oceanic registered at the port of Philadelphia and valued at five thousand ($5,000) dollars.

(*c*) One hundred dollars collected from Henry Gerting.

(*d*) The gold watch and chain of the said Charles. And your petitioner avers and charges that the said moneys and securities have been falsely and fraudulently withheld from the estate of the said Charles Gerting, and converted to the use of the said William.

*Fourth.* That the Northern Central Railway Company second mortgage five per cent bonds which have been fraudulently withheld from the estate of the said Charles Gerting, and converted to the use of the said William are coupon bonds of the par value of one thousand ($1,000) dollars each and are numbered as follows: 450, 476, 479, 1622, 1623, 1624, 1625, 1626, 1629 and 2219.

*Fifth.* That your petitioner further charges that she is advised and believes that as a part of the scheme of the said William to defraud the estate of said Charles, he has turned over to his son, William E. Gerting, who resides in Baltimore City, the said Northern Central Railway Company bonds, and that he has also turned over to the said William E. Gerting and others all his property and estate so far as your petitioner can learn, thereby rendering it impossible to collect from him the unsettled part of this estate, and your petitioner further charges that the said William E. Gerting even pays with his own check, and has paid for the last three years, the interest or income that has been received by your petitioner from said estate of which the said William is trustee, and your petitioner believes that unless some restraining order of this Court is passed to prevent the said William and his son, William E. Gerting, from disposing of the bonds above mentioned, that they will convert them into money as soon as they have notice of these proceedings, and your petitioner will be unable to collect the proceeds thereof.

*Sixth.* That in addition to the matters set forth in the preceding paragraph of this petition your petitioner charges that on the first day of June, in the year 1893, the said William sold the interest of the said Charles in the lumber business of John DuBois and Company in the city of Havre de Grace, for the sum of nine thousand ($9,000) dollars and received the money

for the same; and your petitioner further charges that the said William as executor and trustee failed to make return to the Orphans' Court of Harford County of the interest so held by the said Charles in said partnership, as will appear by a certified copy of the appraisement and inventory herewith filed as part of this petition and marked Exhibit M. L. W., No. 1, and that the accounts filed by the said William in said estate and in this case are so meagre and incomplete that your petitioner cannot say whether the said sum has been properly accounted for or not, and therefore she charges that the said William has failed to account for the said sum, and that the same has been unduly and improperly withheld from said estate.

*Seventh.* That the suppression and withholding of the moneys and securities as set forth in the third paragraph of the petition constitute breaches of trust and duty on the part of the said William Gerting, the executor and trustee of such character as to disqualify him from the duties of his office, and your petitioner is entitled to have the said William Gerting removed from the said office of executor and trustee and to have some competent person appointed as his successor; to have a full and detailed account of said estate in addition to the matters contained in the several reports heretofore filed in this cause, together with the income thereon, and an order of this Court requiring the said William Gerting or William E. Gerting, his son, to produce in this Court at once the ten second mortgage bonds of the Northern Central Railway Company as above set forth, and an order of this Court passed restraining and prohibiting the said William Gerting from in any way selling, or disposing of any other securities or funds belonging to this estate.

To the end therefore: (1) That the said William Gerting may account for the moneys and securities so withheld by him from said estate of Charles Gerting set forth in this petition so that he may not only be charged with the principal, but the income thereon.

(2) That the said William Gerting may be removed from said office of executor and trustee under the last will and tes-

tament of Charles Gerting, deceased, and that some suitable person may be appointed as his successor in said trust.

(3) That an order of this Court may be passed restraining the said William Gerting and William E. Gerting, his son, as prayed in said petition, and require them to produce in this Court at once to be held subject to its order the ten second mortgage bonds of the Northern Central Railway Company above mentioned.

(4) And for such other and further relief as your petitioner's case may require.

An injunction was granted as prayed. The respondents filed separate answers. William Gerting denied each and every allegation contained in the third paragraph of said petition, and charged and averred that the allegations therein contained were not only made recklessly and falsely, but willfully and maliciously, and denied that the ten thousand ($10,000.00) dollars of the Northern Central Railway second mortgage five per cent bonds mentioned in said paragraph were owned by the said Charles Gerting, and denied that they constituted any part of his estate, but averred that they were owned by himself individually.

*Second.* He denied that the said Charles Gerting owned any share or shares of stock in the steamer Oceanic at the time of his death.

*Third.* He denied that Henry Gerting owed Charles Gerting at the time of his death the sum of one hundred dollars, or any other sum so far as he knew and denied that he had collected from said Henry Gerting any money after the death of Charles Gerting due and owing to his estate.

*Fourth.* He averred that Charles Gerting in his lifetime gave to him his gold watch and chain and that this gift was known to the petitioner about the time and has been known to her ever since, and that she also knew it was not accounted for in the estate.

*Fifth.* He denied that any part of the estate of the said Charles Gerting had been withheld as charged in the bill and particularly denied all allegations of fraudulent conduct on his part therein alleged.

The separate answer of William E. Gerting denied the truth of the allegations in the fifth paragraph of the bill, viz.: That William Gerting had turned over to him the Northern Central Railway bonds in said petition mentioned or any other bonds of said railway mentioned. He admitted that several times he had sent his individual check to the petitioner for the interest ·or income due her, but he denies it was done with any intention on his part or that of William Gerting as a part of a scheme to defraud the estate of Charles Gerting, deceased, out of anything.

Upon the issues thus made by the petition and answer a great mass of testimony was taken and numerous exceptions were filed to parts of the testimony. By its decree of October the 6th, 1903, the Court sustained the exceptions filed by the plaintiff to the testimony of William Gerting and William E. Gerting in so far as they undertook to testify to any declaration had with or statements made by Charles Gerting in his lifetime to either of them. It also sustained the exceptions on the part of the defendants to the testimony offered by the plaintiffs of declarations of Charles Gerting in his lifetime. This testimony was inadmissible under the Act of 1902, chap. 495, and was properly excluded. The result of the rulings upon the exceptions to evidence, in all of which we concur, was the exclusion from the case of a large amount of testimony which if admissible would have been of much weight and importance.

The decree sustained the claim of the petitioner against both William and William E. Gerting as to the ten bonds of the Northern Central Railway Company and ordered them to deliver said bonds, or the equivalent of said bonds and coupons thereto attached after January the 1st, 1903, to her. It further decreed that William Gerting owed the plaintiff $197.50, being the sum collected by him, and due the estate of Charles Gerting from the insolvent estate of Nicholson & Sons. It also found that William Gerting had collected from Henry Gerting in the lifetime of Charles the sum of one hundred dollars due Charles for which he had never accounted. These

sums he was ordered to pay to the petitioner. It made the injunction theretofore granted perpetual, and reserved the question as to the removal of the trustee for the further order of the Court. In its decree the Court takes no notice of the petitioner's claim to the testator's interest in the steamer Oceanic, and in the firm of DuBois & Co., or of her claim for the testator's watch and chain. From this decree both William Gerting and William E. Gerting have appealed, but no appeal has been taken by Mrs. Wells. It thus appears that only three questions are presented for consideration on this appeal.

*First.* The ownership of the ten Northern Central Railway bonds.

*Second.* The sum of one hundred dollars alleged to have been collected by William Gerting from Henry Gerting.

*Third.* The $197.50 collected by William Gerting from the insolvent estate of J. J. Nicholson & Sons.

While the record is voluminous, by the rulings of the Court upon exceptions to evidence, and the practical abandonment by the petitioner of her claim to the watch and chain, and to her father's interest, alleged to be unaccounted for, in the steamer Oceanic, and in the firm of Dubois & Company, much the larger part of the evidence becomes irrelevant to the question presented in this Court, and a great deal of that which is relevant is conflicting and most unsatisfactory.

The main question in the case is this: To whom did the ten bonds mentioned in the petition belong at the time of the death of Charles Gerting? If the title to these bonds was vested in Charles Gerting at the time of his death, or if any part of said bonds were owned by him at that time, it passed to and became vested in his executor, William Gerting, upon his qualification as such in the Orphans' Court for Harford County. He has not accounted to Mrs. Wells for these bonds, or any portion thereof, as it was his duty to do, if the whole, or any part thereof belonged to the testator at the time of his death.

There are certain undisputed and controlling facts bearing

upon the purchase and ownership of the bonds which will be first considered before the testimony of the witnesses offered in support of the claims of the respective parties is examined. On the 26th of August, 1884, Henry Gerting bought of J. J. Nicholson & Sons six one thousand dollar Northern Central Railroad Company second mortgage five per cent coupon bonds, numbers 1622, 1623, 1624, 1625, 1626, 1629. On the 27th of August, 1884, he deposited these bonds in his own name with the Safe Deposit and Trust Company of Baltimore, and received from it a certificate of deposit therefor. The circumstances under which the bonds were purchased are thus stated by Henry Gerting, "Charles came to see me, and he said I should go to see Harry Hopper, and he would give me a check for six thousand dollars, and I should go and buy five per cent railroad bonds, Northern Central Railroad bonds, for that money which I did.   After I bought the bonds I went and deposited them in the Safe Deposit Company in my name.   After a short time he came again and he says to me, he says I want them bonds transferred to my name, and I says that is all right, and I went up there with him, and had them transferred in his own name, and that settles it, they were his bonds ever afterwards." These bonds remained on deposit in the name of Henry Gerting until the second day of February, 1885, on which day Henry and Charles Gerting went to the Deposit Company, surrendered the certificate issued to Henry Gerting, withdrew the bonds, and then redeposited them, together with one other Northern Central second mortgage coupon bond numbered 476 for one thousand dollars, in the individual name of Charles Gerting, to whom a certificate of deposit was issued by the company.   On the 10th of July, 1885, Charles Gerting deposited in his own name one other bond numbered 450 of the same company, and for a like amount, and received a certificate therefor. These eight bonds remained on deposit with the Trust Company in the sole name of Charles Gerting until the 22nd day of December, 1885, on which day Charles Gerting surrendered the certificate of deposit, withdrew the bonds and took them away.   Four days

later Charles and William Gerting went together to the Trust Company, and redeposited these eight identical bonds in their *joint names* and received a certificate of deposit reciting that the company had received from Charles and William Gerting these bonds, which it agreed to hold on deposit subject to the order of either. These eight bonds remained on deposit, without addition thereto, in the joint names of Charles and William Gerting until the 17th day of October, 1888, when two more bonds of the same issue and for like amounts (Nos. 479 and 2219) were deposited by Charles and William Gerting in their joint names subject to the order of either.

The proof therefore shows that on the 17th day of October, 1888, the identical bonds in controversy were on deposit with the Safe Deposit and Trust Company in the joint names of Charles and William Gerting, that they had been so deposited by their direction, and it also appears that they remained so deposited in their joint names at the time of the death of Charles Gerting in August, 1892. The testimony is silent as to the purchase of bonds numbers 450, 476, 479 and 2219. By whom, or from whom, or with whose funds they were bought does not appear. The six bonds bought by Henry Gerting from Nicholson and Sons were paid for by the money gotten upon the order of Charles Gerting from Hopper and Company. But it is by no means clear that this money was wholly the money of Charles Gerting. The record shows that the most intimate and confidential relations existed between Charles and his brother William, and that large sums of money had been sent at various times by William to Charles, and it also appears that the account with Hopper & Company for the greater part of the time was a joint account of Charles and William Gerting. It cannot therefore be said that as to the six bonds bought by Henry Gerting they were the sole property of Charles Gerting, and it is fair to presume that the title to all the bonds involved was vested in Charles and William Gerting as co-owners at the time of Charles death, unless the testimony offered in support of the claim of William Gerting shows that the title of Charles was transferred to him. The

presumption as to the co-ownership of those bonds is strength-
ened by the action of Charles and William Gerting in their
dealing with the bonds.    They declared themselves, by the
terms of deposits with the Trust Company, the last and only
clear evidence of title, to be co-owners of these bonds.    This
co-ownership as fixed by themselves so far as the same is ev-
idenced by the certificates of deposit continued down to the
death of Charles Gerting; and long after the qualification of
William Gerting as executor.

Upon this state of facts we think it clear that one-half of
these bonds belonged to the estate of Charles Gerting, and the
trustee should account to Mrs. Wells for them, unless the ev-
idence offered by William Gerting is sufficient to show the
title of Charles is now vested in him.    The evidence upon
which he relies to support his title to the sole ownership of
the bonds is found in the testimony of Frederick Gerting and
Sylvester Penning, and consists of statements made by Charles
Gerting in July, 1892, and in August, 1892, at and about the
time the will was made.    It must be conceded that this evi-
dence should not be permitted to defeat the plaintiff's right to
one-half of these bonds, unless it clearly appears that Charles
Gerting's title thereto had been divested.    The evidence of
Frederick Gerting upon this point is found on page 192 of the
record, and is as follows: Q. "Did he tell you anything about
his ownership of any bonds, or his not owning any bonds, or
what did he tell you?    A. He told me that he owned no
bonds, that what bonds there was was Williams.    Q. How
was it that he told you about the bonds?    A. We were in
a general conversation about the business of one another, and
I asked him the question, I says, "have you got any bonds,"
and the reply he made was "I have no bonds; what bonds
there is, is Williams."    The evidence of Mr. Penning, found
on page 215 of the record, is as follows: Q. "At the time of
the execution of the will of Charles Gerting as you have tes-
tified, did he tell you of what his estate consisted, and if so
how did he come to tell it, and what did he tell you?    A. I
asked Mr. Gerting of what his estate consisted, and he told

me there was a brick house in Havre de Grace, and the house-hold furniture in it, his interest in the DuBois & Company's mill in Havre de Grace, the money that he had in the Eutaw Savings Bank, and the money in the Southern Building Association; I made a memorandum at the time as well as the draft of the will, and I have made diligent search for them among my old papers, but I failed to find them. He stated that there had been some bonds at the same time, but they were all Williams." When it is remembered that at the very time these declarations were made the legal title to one-half of these bonds was in Charles Gerting, it must be conceded that these declarations of themselves did not operate to divest . him of that title. This has been settled by many decisions in this State. *In re Bauernschmidt Estate*, 97 Md. 59–62; *Taylor* v. *Henry & Bruscup Admrs.*, 48 Md. 557–558, and other cases.

This is the only evidence in the record to sustain the claim of William Gerting to the sole ownership of the bonds, and in our opinion, is legally insufficient to support his claim. If there had existed an understanding between these brothers to the effect that William should have the bonds there is no evidence of it in the record, and, as the title to one-half thereof was vested in Charles at the time of his death, William as trustee, must account therefor, together with one-half of the interest thereon collected by him as executor and trustee.

Upon this branch of the case our conclusion is that it was error to have held William Gerting liable for the whole amount of the bonds and the coupons collected by him and William E. Gerting, as was done by the decree. The whole decree as to William E. Gerting is erroneous, as there is no evidence that the bonds are now, or ever were in his possession, and that in collecting the coupons he was not acting in the utmost good faith. There is nothing to show that he had knowledge of, or had any reasons to suspect any fraud or breach of trust on the part of the trustee, if any such existed.

As to the one hundred dollars alleged to have been collected by William Gerting from Henry, this claim rests upon the

testimony of Henry Gerting alone.   His testimony upon this point is so absolutely discredited by that of William and Frederick Gerting, and by other circumstances appearing in the record, that we cannot accept it as reliable evidence.   This claim should have been rejected.

The bill makes no claim for the money received by William Gerting from the insolvent estate of Nicholson & Sons, and it is argued for the appellants that the decree in that respect is erroneous because not in conformity to the relief asked in the petition ; while the appellee contends that it was properly allowed under the prayer for general relief.   It is provided by section 36, Art. 5 of the Code of Public General Laws that : "On an appeal from a Court of equity, no objection to the competency of a witness, or the admissibility of evidence, or to the sufficiency of the averments of the bill or petition, or to any account stated and reported in said cause, shall be made in the Court of Appeals, unless it shall appear by the record that such objection was made by exceptions, filed in the Court from which such appeal shall have been taken."   This section modifies the former practice as it existed in this State.   In the absence of proper exceptions filed in the Court below it was the duty of that Court to decree according to the proof.

In *Schroeder, Admr.,* v. *Loeber,* 75 Md. 202, it is said : "It is no matter whether the averments of the bill cover the case proved in evidence or not, we are obliged to decree according to the matters established by proof.   The section of the Code is made up chiefly of the Act of 1832, chapter 302, section 5. It has been frequently construed, and the practice under it is well established.   In *Harwood et al.* v. *Jones,* 10 Gill & Johnson, 419, this Court said : "The decree of the county Court, it is said, must be reversed on account of the variance between the allegations in the bill and the proofs in the cause.   Whether there be such variance or not, we have deemed it unnecessary to inquire, because, according to our interpretation of the fifth section of the Act of 1832, chapter 302, it is immaterial whether there exists such variance or not ; no exceptions having been filed in the Court below, either to the admissibility of

the evidence, or the sufficiency of the averments of the bill, the complainant is entitled to the affirmance of the decree in this Court, if warranted by the proof, whether his *allegata* and *probata* correspond or not."

When John B. Deming, one of the witnesses produced on behalf of the petitioner, was asked to produce the receipt of Mr. Samuel D. Schmucker, the permanent trustee of Nicholson & Sons, given by William E. Gerting as attorney for William Gerting, administrator of Charles Gerting, for $197.31 Mr. Young noted an exception, but no exception was filed to the testimony of Mr. Deming, or to the introduction of the receipt in evidence. The noting of the exception, at the time of taking the evidence, is not a compliance with the section of the Code above quoted. In *Freeney* v. *Freeney*, 80 Md. 409, it is said: "If it is decided to except to testimony taken before an examiner, to be used at the hearing of a case in a Court of equity, it is sufficient to have the examiner note the objection (Code, Art. 16, sec. 222), without setting forth the ground on which such objection or exception is based, unless when a question is objected to because it is leading, in which case the ground of the objection should be stated by the attorney making the objection and recorded by the examiner, in order that an opportunity may be afforded for changing the form of the question. Under rule 43 of general equity rules, adopted by this Court (sec. 223, Art. 16 of the Code), evidence taken and returned by an examiner shall remain in the Court ten days, subject to exceptions before the cause shall be taken up for hearing, unless by agreement of the parties such time be waived. Ample time, therefore, is afforded for the preparation of exceptions, if counsel wish to avail themselves of it. Every exception to testimony must be reduced to writing and filed in the case, at least before the hearing begins. It will not do, as was done in this case to except generally to *all* of the testimony objected to and noted by the examiner. Every exception should clearly indicate the testimony excepted to, the ground on which the exception is based, and the name or names of the witnesses whose testimony is excepted to should be set forth."

The objection, therefore, that the decree is not in conformity to the relief asked for in the petition is not, for the reasons stated, open for consideration on this appeal. The evidence shows that William Gerting received two dividends from the estate of Nicholson & Sons; $197.31 on July 23rd, 1897, and $7.68 on the 16th day of February, 1900, but as the proof shows that the claim upon which the dividends were paid was a joint indebtedness due by the firm to himself and Charles he should only be charged with one-half of the amounts received with interest from the date of payment.

It follows that the decree must be reversed, and the cause remanded for a new decree in conformity to this opinion.

> *Decree reversed, and cause remanded, costs below to be paid by William Gerting, and one-half of the costs in this Court to be paid by William Gerting, and the other one-half by Mrs. Wells.*

(Decided June 16th, 1906.)

PEARCE, J., dissented and delivered the following opinion.

I cannot agree with the views of the Court on the principal question in this case, the ownership of the ten Northern Central Railway bonds at the time of the death of Charles Gerting, and as the conclusion reached by the Court convicts William Gerting of the fraudulent appropriation of these bonds to his own use, in violation of his oath, as executor, of which I do not believe he is guilty, I feel that it is due to him that I should state the reasons for my own conclusion.

It is correctly stated in the opinion of the Court that the six bonds first purchased by Henry Gerting for Charles by his direction, were paid for with money drawn from the account of Charles Gerting with Hopper & Co., bankers in Baltimore. It is also correctly stated that these six bonds, with two others, subsequently obtained by Charles Gerting, were by him deposited in the Safe Deposit Company in his sole name, and so stood until December 22nd, 1885, when he withdrew these

eight bonds, and four days later Charles and William went together to the Safe Deposit Company, and these same eight bonds were re-deposited in their joint names, subject to the order of either, and that on October 17th, 1886, two other bonds were in like manner deposited by them and that these ten bonds so remained deposited at the time of the death of Charles Gerting in August, 1892. It is also stated in the opinion of the Court that it appears that the account with Hopper & Company for the greater part of the time was a joint account of Charles and William Gerting, and that it cannot therefore be said that the six bonds bought by Henry Gerting were the sole property of Charles Gerting, but that it was fair to presume that the title to all the bonds involved was vested in Charles and William Gerting as co-owners at the time of Charles death, unless the testimony offered in support of the claim of William Gerting showed that the title of Charles was transferred to him; that the only evidence upon which he relied to support his title was the statements of Charles Gerting made by him to Frederick Gerting and Sylvester Penning, and that it had been settled by many decisions in this State, such as *In re Bauernschmidt*, 97 Md. 62, and *Taylor* v. *Henry*, 48 Md. 558, that these declarations did not of themselves operate to divest Charles Gerting of that title.

I have carefully examined the voluminous record in this case, and I can find no evidence that the account with Hopper & Company was at any time a joint account of Charles and William. Mr. Hopper, who should know this, if it were a fact, speaks of it always as the sole account of Charles. William Gerting did, it is true, state at the time the first bonds were purchased, "Henry Hopper had his money," but he did not say the account was a joint account; on the contrary he said Charles at that time gave him a statement showing that he *owed him $4,000*, which could not have been the case, either if the account was a joint account, or if half these bonds were the property of William. But all this testimony of William, as properly held by the opinion of this Court, was correctly excluded by the lower Court, and cannot be considered in this

Court for any purpose.   Reference is made by the Court to
the fact that it appears in the record that large sums of money
had been sent at various times by William to Charles (though
it does not appear for what purpose); but it will be observed
that the six bonds which the Court finds were thus jointly
purchased and owned, were purchased by Charles on August
26th, 1884, and up to that time the record only discloses re-
mittances from William to Charles amounting to $893.   The
inference of joint ownership of these six bonds therefore,
whether based upon a supposed joint account with Hopper &
Co., or upon the remittances from William to Charles up to
August 26th, 1884, seems to me to be wholly without war-
rant, and the subsequent inference that this joint ownership
extended to all the bonds involved, seems to me a mere pre-
sumption founded upon a prior presumption, which is itself
without substantial foundation.   The total additional remit-
tances by William to Charles subsequent to August 26th,
1884 and up to December, 1887, were $3,970.

. But without dwelling upon this view of the case, the Court
says this presumption is strengthened by the fact "that they de-
clared themselves, by the terms of the deposit with the trust
company, the last and only clear evidence of title, to be co-
owners of these bonds, and that this co-ownership continued
down to the death of Charles Gerting, and long after the qual-
ification of William Gerting as executor."

It is not material to the view which I entertain of this case,
whether all or only one-half of these ten bonds were pur-
chased with the money of Charles Gerting, and I shall there-
fore not pursue that question.   If all of them were purchased
with his money, the title thereto would not be affected by the
deposit to their joint order, and if only one-half were so pur-
chased, the title to the one-half would still remain in him un-
affected by such deposit.   The title, either to the whole, or
the half, could not be transferred to William without proof of
some sort to show that Charles had relinquished his dominion
and control over the whole or the half as the case may be.
*Whalen* v. *Milholland*, 89 Md. 199.

In that case, the deposit was to "A & B, *joint owners*, payable to the order of either or the survivor," and the money when deposited, was the money of A alone.    The Court held that the retention of the pass-book by A, at her death, *unexplained by any evidence as to such possession*, was evidence of continued ownership by her, and showed that she still retained dominion over the fund.    I concurred in that opinion, and do not now desire to question or impair its authority, but I maintain that it has no application to the facts in this case, as presented by the testimony.    All that *Taylor* v. *Henry*, 48 Md. 558, and the *Bauernschmidt case*, 97 Md. 62, decide *upon this point*, is that mere declarations of *a purpose to make a gift*, does not constitute a gift, and this is made clear by the language of the Court in *Whalen* v. *Milholland, supra*, page 201, where it is said: "It (the gift) must go into effect at once, or in other words, transfer the property at once and completely; for if it has reference to a future time when it is to operate as a transfer, it is nothing more than a promise without consideration, and cannot be enforced either at law or in equity."

Now, conceding here, for the present purpose only, the co-ownership of these bonds to have continued up to some period shortly before the death of Charles, the *continuation* of this co-ownership up to the time of his death is the question for determination, upon the testimony in the case, and the legitimate inferences to be drawn therefrom, according to the established rules for the consideration of testimony.

In the opinion of the Court it seems to be assumed as a fact in the case, that because the certificate of deposit was shown to be in the possession of Charles a month or two before his death, that it so remained until after his death, and that there was, therefore, no transfer of the title to these bonds to William ; that he secured possession of this certificate after, and by virtue of his qualification as executor of Charles, and that his possession of the bonds, was as executor, and not in his own right.    This would undoubtedly be the correct inference if there were nothing in the case to show in what right he received this certificate and held these bonds.    But there is, in

my judgment, abundant evidence to show his possession of this certificate *as owner* of these bonds, as I shall attempt to show as briefly as I can.

It must be remembered that fraud is never to be presumed, but is always to be proved, though not necessarily by direct evidence, and that wherever special circumstances exist, aiding the general presumption of innocence, they should be given their due weight. In this case all the testimony admitted, shows that throughout their whole lives, the relations of Charles and William had been affectionate and confidential. Only a few weeks before his death, Charles constituted William executor of his will and trustee for his daughter, with unusually broad powers, excusing him from giving bond, declaring his entire confidence and faith in him, and in the contingency of his daughter's death under twenty-five and without issue, left the whole estate to William, except a legacy of $2,000 to his brother Frederick. William was at his home in New York when this will was drawn, and had no knowledge that a will had been made, or was in contemplation, until he came to Charles house two days before his death. Mr. Penning, the attorney, who drew the will, in accordance with Charles directions, did not know William Gerting and never saw him until the day of the funeral, so that it is clear the will must have embodied the deliberate and uninfluenced wishes of the testator. William Gerting, as executor, made oath that he would well and truly administer the estate, and that the final administration account which he rendered was a true and full administration of the estate. The most solemn oaths are indeed sometimes deliberately violated, but the legal presumption is that they are observed and kept until proof is made to the contrary. Trustees sometimes rob instead of protecting the estates committed to their care, but when charged with this crime, they are entitled to the full benefit of all the presumptions of innocence which the law provides for those accused of its violation and these presumptions are as efficient and persuasive in civil as in criminal proceedings. In discussing this principle in *Brewer* v. *Bowersox*, 92 Md. 574,

a case very similar to the present, the Court said "Every presumption obtains in favor of innocence and good faith. Where an act may be innocent or culpable, *as antecedent circumstances make it the one or the other*, and those antecedent circumstances are not disclosed ; the plainest dictates of justice require that the act shall be treated as an innocent act. And so when the alternative is as to whether the act is rightful or wrongful, the act being one that may be either, according to its environments, and there is nothing to show that it is wrongful, the natural and general presumption, founded on observation and experience, is that it was rightful."

This language was used in an inquiry whether the wording by the wife of a certificate of deposit of the *husbands's money*, and the possession by her of this certificate during his life, was wrongful, so as to divert his money from his estate without his consent, and the fact that it was used in *that connection*, emphasizes its applicability to the question now under consideration.

I concur in the opinion expressed by the Court that Henry Gerting cannot be regarded as a reliable and truthful witness, and I cannot, therefore, in the face of William's denial, accept Henry's statement of what William told him of these bonds. The inherent improbability that a man engaged in the perpetration of such a fraud as is here charged, should voluntarily place the proof of his guilt in possession of another, and especially of a brother of the person defrauded, is such as to tax my credulity beyond its limit. Can it be believed that either shortly before or shortly after informing Henry that Charles owned ten thousand dollars in bonds at the time of his death, he fraudulently omitted them from the inventories, and the administration account, and converted them to his own use? I cannot believe it. The alleged conversation with Henry occurred soon after the death of Charles, but was never disclosed by Henry until more than ten years later, when he wrote Mrs. Wells the letter of February 9th, 1902, instigating this litigation by her and evincing his hostility to William.

Moreover it is undisputed that from October 17th, 1888,

until December 19th, 1892, these same ten bonds were in the
Safe Deposit and Trust Company of Baltimore, in the joint
names of Charles and William when they were withdrawn by
William upon surrender of the certificate of deposit. They were
not therefore in possession of Charles at or shortly before his
death, and could not have been produced by William at request
of Charles from his desk, nor have been looked over by him,
and pronounced to be "all there." This fact demonstrates
the untruthfulness of Henry, and requires the rejection of his
testimony when denied by William, and not sustained by other
credible testimony.

William Gerting being incompetent to testify to any con-
versation or transaction had by him with Charles, "the ante-
cedent circumstances" attending the possession by him of this
certificate of deposit, and the "environments" of the act of
withdrawing the bonds as his own property cannot be given by
him, and if without his explanation of these "antecedent circum-
stances" and "environments" he would be held to account to
his brother's estate for these bonds, he should be so held now.
But in my judgment these circumstances are made to appear
sufficiently from other competent testimony in the case.

Frederick Gerting, the brother to whom Charles left the
contingent legacy of $2,000, testified that on the 2nd or 3rd
of July, 1892, at Charles' house in Havre de Grace, in the
course of a general conversation about the business of each
other, he asked Charles if he had any bonds, and he replied:
"*I have no bonds.    What bonds there is, is Williams.*" This
was about six week *before* the will was drawn, and it should be
noted that the form of the reply seems to indicate that he had
owned some bonds at one time, but that those bonds now be-
longed to William.    He does not merely answer "no," as
would have been natural, if William had no connection with
the bonds, but he says in effect, "I did have some bonds, but
all those bonds *now* belong to William."

Mr. Penning who drew the will on August 16th, 1892, says
when he was called in for this pupose, he asked Charles to
state of what his estate consisted, and that in reply he enu-

merated the following items: Brick house in Havre de Grace and the furniture in it; his interest in the DuBois sawmill; money in the Eutaw Savings Bank, and money in the Southern Building Association.   Can it be believed that if he possessed these bonds of the value of $10,000, he could have forgotten the fact, or have omitted to mention them in enumerating the items of his estate for Mr. Penning's information? They constituted the largest item in his estate (if a part of it), and the most important to mention to his counsel, since they were not visible and apparent like the house and furniture, or known to friends and neighbors as was his interest in the firm of DuBois & Co.; and the only explanation of his failure to enumerate them, as a careful, successful business man, accustomed to saving and investing, is that he *knew he then had no bonds.*   Upon a visit of Mr. Penning a few days after the execution of the will, Mr. Penning testifies that Charles said, "there had been some bonds, but they were all Williams." Evidently his mind reverted to the enumeration of his estate which he had given Mr. Penning when the will was drawn, and he wished him to know that he had not omitted anything from that enumeration.   The form of his statement expresses clearly the meaning I have attributed to his reply to Frederick, viz.: "That he had owned some bonds, but that these all now belonged to William."   How they belonged to William, whether by actual, completed, gift, by purchase, or as the result of a settlement of mutual accounts, it was not necessary for him to say, nor for the Court to know, provided the ownership had been in some manner transferred.   It is enough for this purpose to know, in the absence of positive proof to the contrary, that he disclaimed the *ownership* and affirmed it to be in William.

It is important to observe here that the language of Charles does not import a *gift* at all, either a proposed or a completed gift.   He does not say "I intend to give these bonds to William" or "I have given them to William."   The language imports a transaction based upon a proper and valuable consideration, for which he had parted with his dominion and

control over these bonds, and had actually transferred the title to William.   If that was the fact (and no one could know this better than he) it is not material that he did not at the time, or at sometime before his death, deliver the certificate of deposit to William.   Delivery of the certificate would be material to the validity of a *gift* of the bonds, but not so as to a purchase, or a settlement of accounts supported by a valuable consideration.   The inference drawn by the Court from the language of Charles and the surrounding circumstances, so far as they are disclosed, is that Charles referred to an intended gift of these bonds to William, and that as there is no proof of delivery of the certificate the gift fails.   Its further inference is that William, after qualifying as executor, got possession of this certificate, and then illegally and fraudulently converted the bonds to his own use; thus by inference in the face of Charles declaration that the bonds belonged to William, fastening upon him a large pecuniary liability and the odium of attempted fraud.

The inference I would draw from the language of Charles, and the antecedent and surrounding circumstances of the act of William in treating the bonds as his own, is drawn from the natural construction of the language, which does not import a gift at all.   The construction given by the Court makes the act culpable.   Mine makes it innocent, and mine is in accord with the rule declared in *Brewer* v. *Bowersox, supra,* while that of the Court, as I understand this case, ignores that rule.

There was no attempt to impeach either of these witnesses. Both are disinterested, and one of them, in addition to his oath as a witness, appears as a lawyer in presumed good standing among the members of his own bar by whom this case was conducted, and is bound by his oath as an attorney, to demean himself justly and honorably in all things.   I can discover nothing in the record to discredit the truthfulness or accuracy of either, or to justify me in rejecting their testimony and practically treating them as conspirators with William Gerting to defraud his dead brother's child.

If not rejected, theirs is the controlling testimony in the

case, and I must be governed by it in determining the owner-
ship of these bonds at the time of the death of Charles Gert-
ing.    In my judgment, the declaration of Charies Gerting, es-
tablished by two creditable· witnesses, show that these bonds
were the property of William Gerting, and I cannot therefore
concur in an opinion which requires him to account for any
part of them to the estate of his brother.

(·Filed August 13th, 1906.)